PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARK DRAGOMIER, *et al.*,                    )
                                             )    CASE NO. 4:11cv862
          Plaintiffs,                  )
                                             )
          v.                            )
                                             )    JUDGE BENITA Y. PEARSON
INTERNATIONAL UNION UNITED                   )
AUTOMOBILE, AEROSPACE AND                    )
AGRICULTURAL IMPLEMENT                       )
WORKERS OF AMERICA, LOCAL 1112,              )
*et al.*,                                    )    **MEMORANDUM OF OPINION AND**
                                             )    **ORDER** [Regarding ECF Nos. 20; 21; 22;
          Defendants.                  )    32]

      This matter is before the Court upon the Motions for Summary Judgment on Threshold

Legal Issues filed by Defendants Local 1112 International Union United Automobile, Aerospace

and Agricultural Implement Workers of America ("Local 1112"); General Motors, LLC ("GM");

and International Union United Automobile, Aerospace and Agricultural Implement Workers of

America ("UAW") (collectively "Defendants"). ECF Nos. 20; 21; 22. Also before the Court is

the Notice of Discovery Dispute filed by Plaintiffs. ECF No. 32. For the reasons that follow, the

Court denies Defendants' motions; Plaintiffs' Notice of Discovery Dispute is moot.

## I. Background

### A. Undisputed Facts

#### 1. The Parties

      Plaintiffs are a group of 28 employees of GM who work in various departments in GM's

Lordstown Complex East Assembly Plant in Lordstown, Ohio. ECF No. 1 at 5. The UAW and

(4:11cv862)

Local 1112 (collectively "union") are labor organizations and the bargaining representatives of GM employees, including Plaintiffs.  ECF No. 1 at 5.  Plaintiffs, UAW, Local 1112 and GM were all subject to the terms of the collective bargaining agreements between General Motors Corporation and the United Auto Workers, dated September 18, 2003 (the "2003 CBA") and September 26, 2007 (the "2007 CBA").  ECF No. 9 at 2.  The CBAs provide the exclusive obligations of the parties relating to wages, benefits, and working conditions.  ECF No. 21-1 at 7.

### 2. Employment History

On October 16, 2006, GM hired a number of temporary employees for a limited period of time, including Plaintiffs.  ECF No. 1 at 5-6.  On April 30, 2007, Plaintiffs were terminated. ECF No. 40 at 18.  In November 2007, Plaintiffs were rehired as temporary employees.[1]  ECF No. 40 at 18.  On June 13, 2008, Plaintiffs signed new employment agreements re-categorizing them as "non-core" workers, thereby decreasing their wages and benefits.  ECF Nos. 1 at 7; 21-1 at 10.  The "non-core" category was implemented pursuant to the recently executed 2007 CBA. ECF No. 40 at 19.  On and around July 7, 2008, GM hired regular, "core" employees for a third shift at the plant.  ECF Nos. 1 at 9; 21-1 at 9.

### B. Disputed Facts

### 1. Plaintiffs' Allegations

Plaintiffs allege that, due to information they discovered in February 2009, the initial April 2007 terminations violated the CBA.  ECF No. 40 at 20.  Plaintiffs further allege they were

---

[1]  Plaintiffs state the November rehiring date as November 15, 2007 in the Complaint (ECF No. 1 at 7), and November 30, 2007 in their Opposition brief (ECF No. 40 at 18).

2

(4:11cv862)

improperly classified upon their rehiring in November 2007; as a result, they did not obtain the correct seniority date.  ECF No. 1 at 7.  Plaintiffs contend they signed the June, 2008 employment agreements "under duress and without fair representation by the union" (ECF No. 1 at 8), and that they were not properly elevated when GM hired permanent employees in July 2008, all in violation of the CBA.  ECF No. 1 at 9.

### 2. Defendants' Responses

Defendants generally deny the allegations.  ECF Nos. 7; 8; 9.  Defendants further assert that Plaintiffs' claims are time-barred, and that all but one, or at the most four, of the Plaintiffs failed to exhaust internal remedies.  ECF Nos. 7 at 4; 8 at 1; 9 at 5.

### C. Procedural History

Because of the alleged violations and in accordance with union policy, Plaintiff Dragomier, allegedly along with a disputed number of employees, asked Union Shop Chairman Ben Strickland to file a grievance on his/their behalf.  ECF No. 20-2 at 1.  Strickland declined to do so.  ECF No. 20-2 at 1.  Because of Strickland's denial and in accordance with union policy, it is undisputed that Plaintiff Dragomier: initiated an internal union appeal on February 23, 2009 regarding the failure of the union representative to file a grievance; initiated a second level appeal on March 9, 2009; and advanced an appeal to the final level on January 19, 2010.  ECF No. 21-1 at 12-13.  The appeals were rejected.  ECF No. 22-1 at 5.

On April 30, 2012, Dragomier and 27 other employees ("Plaintiffs") filed a Complaint in the instant Court.  ECF No. 1.  Plaintiffs assert two claims: (1) that GM breached the collective bargaining agreement in violation of Section 301 of the Labor Management Relations Act, 29

3

(4:11cv862)

U.S.C. § 185; and (2) that the union failed to file grievances on their behalf, breaching the duty of

fair representation in violation of Section 9(a) of the Labor Management Relations Act, 29

U.S.C. § 159, in conjunction with 28 U.S.C. § 1337.  ECF No. 1 at 12-14.  Collectively, the

claims are known as hybrid § 301/fair representation claims.  ECF No. 22-1 at 7.

Following a Case Management Conference on February 2, 2012, the Court instructed the

parties to proceed first by addressing the threshold legal issues governing the case, including

whether Plaintiffs' claims are barred by the statute of limitations and/or the failure to exhaust

administrative remedies.[2]  ECF No. 17 at 3.  The parties agreed to the following threshold issues:

(1) whether any or all claims relating to temporary employees being released in April,

2007 are barred by the 6 month statute of limitations or a failure to exhaust all levels of the

internal union appeal process?

(2) whether any or all claims relating to Plaintiffs' employment status are barred by the 6

month statute of limitations or a failure to exhaust all levels of the intra-union appeal process?

ECF No. 40 at 35.[3]

## II.  Legal Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and

---

[2]  The Case Management Plan instructed that no depositions be taken without express agreement of the parties or Court order.  ECF No. 17 at 3.

[3]  After Defendants filed motions for summary judgment, Plaintiffs filed a Motion for Leave to Take Depositions and Motion for Stay.  ECF No. 26.  Plaintiff also filed a Notice of Discovery Dispute.  ECF No. 32.  Plaintiffs' Motion was denied.  Order, June 21, 2012.  Because the record is sufficient to determine the outcome of the threshold issues, the discovery dispute, which involved Plaintiffs' objections to Defendants' responses to interrogatories, is moot.

(4:11cv862)

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000). A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322-23.

## III.  Discussion

The questions regarding the statute of limitations and exhaustion of internal appeals are directed at two events: the claims relating to the April 2007 terminations, and the claims relating to employment status.

### A.  Statute of Limitations

Hybrid § 301/fair representation claims are governed by a six-month statute of limitations. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 172 (1983). A claim accrues "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Robinson v. Central Brass Mfg. Co.*, 987 F.2d 1235, 1239 (6th Cir. 1993) (citing *Adkins v. International Union of Elec., Radio & Mach. Workers*, 769 F.2d 330, 335 (6th Cir. 1985)). Separate causes of action in a hybrid/fair representation claim accrue simultaneously, and "the timeliness of the suit must be measured from the date on which

5

(4:11cv862)

the employee knew or should have known of the union's final action or should have known of the employer's final action, whichever occurs later." *Robinson*, 987 F.2d at 1239 (quoting *Proudfoot v. Seafarer's Int'l Union*, 779 F.2d 1558, 1560 (11th Cir. 1986).

In a fair representation case wherein the breach stems from the union's failure to bring a claim, the statute begins to run when the grievant knew or should have known that the union had elected to proceed no further. *McCreedy v. Local Union No. 971, UAW*, 809 F.2d 1232, 1236 (6th Cir. 1987) ("employee's hybrid cause of action may arise when the union takes an unequivocal position that it will not seek arbitration"). The six-month limitations period is equitably tolled while a plaintiff pursues his or her internal union remedies. *Dunleavy v. Local 1617, United Steelworkers*, 814 F.2d 1087, 1089 (6th Cir. 1987). The statute of limitations is also tolled when a defendant fraudulently conceals facts respecting the accrual or merits of a plaintiff's claim. *Shapiro v. Cook United, Inc.*, 762 F.2d 49, 51 (6th Cir. 1985); *Robinson v. Central Brass Mfg. Co.*, 987 F.2d 1235, 1244 (6th Cir. 1993).

### 1. April 2007

#### a. Whether the Terminations were Proper

Plaintiffs assert they first discovered that the April 2007 terminations were allegedly improper in February 2009. ECF No. 40 at 39. Plaintiffs explain that, as temporary employees who worked 90 days in six continuous months, they should have been granted traditional employee status by April 2007 pursuant to the CBA. ECF No. 40 at 18-19. As traditional employees, Plaintiffs claim they were immune to termination, unless the termination was for a financially-defensible reason. ECF No. 40 at 39. Plaintiffs argue that in April 2007 they

6

(4:11cv862)

believed they were terminated due to a financially-defensible reason and did not therefore

consider those terminations improper.[4]  ECF No. 40 at 20.  It was at a meeting in February 2009

when Plaintiffs claim they discovered the "real reason" for their terminations — Strickland told

Dragomier they were terminated because the plant manager "threw a temper tantrum and in a fit

of anger at Strickland, summarily laid off the 35 employees."[5]  ECF No. 40 at 20, 41.  Plaintiffs

allege the aforementioned amounted to the union fraudulently concealing facts respecting a

potential claim or grievance, thus tolling the statute of limitations until the discovery of the

allegedly improper terminations: February 2009.  ECF No. 40 at 41.

Defendants first argue that, as temporary employees, Plaintiffs' employment was subject

to termination at any time and that the statute of limitations began to run three days after the date

of termination: May 3, 2007.  ECF Nos. 42 at 2; 43 at 9; 44 at 4.  Defendants do not address

Plaintiffs' argument that they had achieved, by virtue of the CBA, traditional employee status.

Appearing to assume, *arguendo*, that Plaintiffs had achieved permanent status, Defendants next

state that if, as Plaintiffs allege, they were immune to termination they would have been immune

regardless of the reason.  ECF Nos. 42 at 4; 43 at 13.  Defendants advance no evidence for this

argument.  As there is disagreement about whether and under what circumstances a permanent

status employee may be terminated, and whether Plaintiffs had achieved that status, a genuine

issue of material fact exists as to whether the terminations were proper.

---

[4]  GM states "Plaintiffs were released in response to changing business needs at the Lordstown Plant."  ECF No. 21-1 at 8.

[5]  During the course of the events described, 35 employees, including the 28 Plaintiffs in the instant action, purportedly were affected and joined in the internal appeals.

(4:11cv862)

### b.  Whether the Affidavits Conflict

To comply with the statute of limitations, Plaintiffs must have filed a claim within six months of discovering the alleged wrongful act, or six months after having a union representative decline to file a grievance on their behalf.  *See Robinson*, 987 F.2d, at 1239.  Plaintiffs submit numerous affidavits in support of their argument that they discovered the alleged wrongful act in February 2009, and were told at that time that the union would not file a grievance on their behalf.  Defendants attack Plaintiffs' affidavits, arguing the affidavits reflect that Plaintiffs knew or should have known about the alleged impropriety and the union's refusal to file a grievance for them much sooner than February 2009.

UAW argues that Dragomier's affidavit submitted to the Public Review Board ("PRB") during the appeals process indicates that Dragomier had notice of the alleged CBA violations earlier, in November 2007.[6]  ECF No. 44 at 5.  Upon inspection of Dragomier's affidavit submitted to the PRB, the Court does not perceive this to be the case.  The information Dragomier attested to, favoritism and discrimination against "our group," was discovered, Dragomier states, in a report "I just received" and facts learned of "[w]ithin the last two weeks." ECF No. 40-38 at 23.  That affidavit was signed July 13, 2010.  ECF No. 40-38 at 26.

---

[6]  UAW suggests that Plaintiffs should have been aware of alleged contract violations in November 2007 because at that time Plaintiffs were re-hired and "worked side-by-side with witnesses to the CBA violation."  ECF No. 44 at 5.  UAW does not advance any evidence for the proposition that merely being present at the plant would have alerted Plaintiffs to this information; that anyone shared this information with Plaintiffs; or, given the presumed size of the plant and its operations, that Plaintiffs and these "witnesses" would be interacting with one another on any meaningful level.  Without more, the Court cannot reasonably find that Plaintiffs knew or should have known based upon some method of proximity-induced osmosis.

(4:11cv862)

Defendants further contend that Dragomier's affidavit submitted to the Court for the

purpose of the lawsuit contradicts Dragomier's previous affidavit submitted to the PRB.[7]  ECF

Nos. 42 at 5; 43 at 12; 44 at 5.  Dragomier states, in his second affidavit, that:

> The union would not release any type of grievable information, to the group or
> myself, only after repeated attempts to get information about our job status, in
> February, 2009, shop chairman Strickland released a few small details.  I felt that
> was enough to write a grievance on behalf of our group of 35 employees.

ECF No. 40-8 at 1.  Defendants assert this conflicts with two paragraphs in Dragomier's first

affidavit, wherein he states,

> **"Long Term Temporary Employees" ("LTTE")**
> 16.      I have made the argument that our group should have been treated as
> "Long Term Temporary Employees". . . . I brought this matter to the attention of
> Ben Strickland before the Company hired another group of Temporary Employees
> . . . . I went to him in approximately February 2008, a number of months after the
> effective date of the '07 Contract in which the LTTE concept was introduced . . .
> He advised me that he had never heard of the concept.  While I can understand
> that, what I do not understand is why the Company and the Union chose not to
> apply this concept to us but did apply it to the newly hired Temporary Employees
> who were hired in July 2008 . . . .
> **Mishandling of the Grievances by the Union**
> 17.      When this whole issue first arose, I wasn't sure whether I had a grievance.
> I went to my committee man and told him about our group's concerns with
> seniority and layoffs.  He immediately told me that the matter had to go to Shop
> Chairman Ben Strickland.  I went to Ben and discussed the matter with him and
> told him that I was concerned that we were not being treated fairly, but we were
> being shoved to the side and relegated to the backwaters.  I asked him to help me
> assert the grievances.  He completely refused.  He didn't even advise me of the
> appropriate grievance procedure but simply said that he would not help us with
> the grievances at all.  He specifically refused to write up the grievances.

---

[7]  Local 1112 asks the Court to strike Dragomier's later affidavit.  ECF No. 43 at 12.
Although Dragomier's affidavits are somewhat rambling and imprecise, they do not plainly
conflict, and the Court is not persuaded by Defendants' interpretation of the affidavits so as to
read them to do so.

(4:11cv862)

ECF No. 40-38 at 24-25.

Defendants argue that, according to the first-filed affidavit, Dragomier knew in February 2008 that Strickland would not write a grievance on Dragomier's behalf.  ECF Nos. 43 at 11; 42 at 6; 44 at 5.  Defendants read paragraphs 16 and 17 coextensively.  However, each appear under different headings and it is not obvious paragraph 17 is to be read into paragraph 16.  Dragomier does not explain what issue he is referring to when he says "when this whole issue first arose." Dragomier and the other affiants consistently state that there were numerous meetings with Ben Strickland and union representatives, and though Dragomier states he discussed the LTTE contract issue with Ben Strickland in February 2008, he does not say that he was aware of the alleged problem with the April 2007 layoff or that he asked Strickland to file a grievance at that time.  The entire affidavit is chronologically muddled; this quality in and of itself does not refute Plaintiffs' version of events given subsequent supplemental affidavits and in the absence of any certain documentation to the contrary.[8]

Defendants do not respond to Plaintiffs' argument and supporting case law that the statute

---

[8]  Plaintiffs assert the union failed to comply with the union constitutional requirement that it notify members in writing that a grievance would not be filed.  ECF No. 40 at 49.  The union's lack of documentation was noted by the PRB in its opinion:

> We remain troubled, however, by the International Union's response to this appeal . . . .  Adequate record keeping is a necessary foundation for providing the reasoned explanations and justifications that satisfy the union's duty of rationality and fairness.  When the union fails to retain sufficient records, its explanations offered in hindsight risk coming across as simply a post-hoc rationale that does not really demonstrate (and therefore may not reflect) what responsible officials were thinking or explaining at the time a now-contested decision was made.

ECF No. 22-6 at 29.

10

(4:11cv862)

of limitations was tolled by virtue of fraudulent concealment on the part of the union. Plaintiffs

sufficiently allege they knew or should have known of the acts constituting either the employer's

alleged violation or the union's alleged breach in February 2009. *See Robinson*, 987 F.2d at

1239. Thus, there is a genuine issue of material fact as to whether the April 2007 terminations

claim accrued on February 23, 2009.

### 2. Employment Status

The operative event pertaining to the question of employment status is the signing of new

employment contracts re-categorizing Plaintiffs as "non-core" employees on June 13, 2008.[9]

ECF Nos. 40 at 44; 42 at 4. Plaintiffs assert they grudgingly signed the contracts after the union

promised reinstatement to their permanent positions "within a few weeks." ECF No. 40 at 44.

When reinstatement did not occur, they "began asking questions and seeking meetings with

union officials." ECF No. 40 at 44. Plaintiffs argue that it was not until November 2008, when

UAW official John Mohan met with them, that they "realized they would not be getting

reinstated and that the union would not file a grievance." ECF No. 40 at 44. Plaintiffs further

note that they never received a written refusal letter, in violation of union constitution and rules.

ECF No. 40 at 44.

GM argues that Plaintiffs knew a grievance would not be forthcoming because the union

they would grieve to is the union that allegedly forced them to sign the agreement. ECF No. 42

---

[9] UAW argues that the June 2008 signing and the November 2007 rehiring constitutes
the same "legal event." ECF No. 44 at 2. However, the record reflects that in June 2008,
Plaintiffs signed new employment contracts re-categorizing them; creating their seniority date;
and reducing pay. ECF No. 1 at 7. Though both dates allegedly involved misclassification, it
cannot be said the June 2008 event was merely a continuation of the November 2007 rehiring.

(4:11cv862)

at 4.  GM offers no evidence in support of this argument.  Plaintiffs, in turn, assert they discussed

the reclassification issue with Strickland; asked him to file a grievance; and that Strickland

"never directly told us 'no,' they just kept putting us off but scheduling more meetings."  ECF

No. 40-7 at 1.  All Plaintiffs attest they attended multiple group meetings "in 2008," in the "fall

of 2008," or in "November 2008" regarding their non-core employment status.  *See, e.g.*, ECF

Nos. 40-8 at 1; 40-15 at 1; 40-22 at 1; 40-12 at 1.

    Dragomier states that he attended multiple meetings beginning in "late July or early

August, 2008," a meeting "sometime in September," and "November, 2008."  ECF No. 40-8 at 1.

Plaintiff Perry states she attended "several group meetings" and avers that the first group meeting

occurred in September 2008.  ECF No. 40-22 at 1.  She additionally states that, at a non-group

meeting with Strickland, "he repeated what was told to us at our first group meeting, which was

that his hands were tied . . . there was nothing he could do.  He continued refuse to file the

grievance."[10]  ECF No. 40-22 at 1-2.

    The affidavits of Dragomier and Perry each reference a meeting that occurred in

September or November 2008, wherein Ben Strickland allegedly refused to file Plaintiffs'

grievance.[11]  Thus, Plaintiffs, in September or November 2008, knew or should have known that

_____

    [10]  Despite assertions by UAW and Local 1112 that Perry's affidavit shows Strickland
refused to file a grievance at the first group meeting, that is not clear from Perry's statement.
Perry states that at the undated non-group meeting with Strickland he continued to refuse to file
the grievance, but it is not clear when his original refusal occurred.

    [11]  UAW and Local 1112 assert that the first group meeting took place in late July or early
August 2008 because Dragomier references a meeting at that time, and Perry allegedly references
denial at the first group meeting.  ECF Nos. 43 at 14; 44 at 9.  As noted, however, though
Dragomier states there was a meeting in July or August, he does not say that meeting was a group

(4:11cv862)

the union had elected to proceed no further.  *See* *McCreedy*, 809 F.2d at 1236.  The record

supports Plaintiffs' assertions, precluding summary judgment against them.

## B.  Exhaustion of Remedies

Before a union member may sue his or her union for breaching the duty of fair

representation, he or she must exhaust the grievance procedure provided by the union

constitution.  *Clayton v. International Union, UAW*, 451 U.S. 679, 692-96 (1981).  A union's

interpretation of its own constitution is entitled to deference as long as it is not unfair or

unreasonable.  *Millwright Local 1079 v. United Bhd. of Carpenters*, 878 F.2d 960, 962 (6th Cir.),

cert. denied, 493 U.S. 965 (1989)); *Dole v. UAW*, 970 F.2d 1562,1567 n.3 (6th Cir. 1992).

If the union refuses to file a grievance on behalf of a member, the UAW's constitution

sets forth procedures for appealing the union's decision.  ECF No. 40 at 7.  There are three steps

to the internal union appeals process: 1) appeal to the local union membership; 2) appeal to the

International Executive Board ("IEB"); and 3) appeal to the PRB.  ECF Nos. 40 at 7; 44 at 10.

The second and third levels of appeal contain a signature requirement.[12]  ECF Nos. 40 at 48; 21-1

at 7.

Defendants agree Dragomier exhausted his internal union remedies because he signed all

the appeal documents, but argue that because Dragomier was the only Plaintiff to do so, the

remaining Plaintiffs did not exhaust their internal remedies.  ECF Nos. 20-1 at 13; 21-1 at 7; 44

_____

meeting, and Perry states the first group meeting took place in September.

[12]  Plaintiffs argue the union constitution is "silent on the issue of group or representative appeals."  ECF No. 40 at 7.  The Court discusses this argument more fully, *infra*.

13

(4:11cv862)

at 10.  Defendants alternatively argue that at most four Plaintiffs exhausted internal remedies

because the IEB caption listed four Plaintiffs making appearances on behalf of the appellants:

Dragomier, Brenner, Clark and Perry.  ECF Nos. 20-1 at 5; 21-1 at 6; 22-7 at 1.

        Plaintiffs assert that Dragomier was representing all 35 appellants; that Strickland, the

IEB and the PRB appeals decisions indicate that the union believed Dragomier was representing

all 35 appellants; and that these issues could have been raised by the union during the appeals

process and were not, precluding these arguments now.  ECF No. 40 at 27, 30, 49-50.  Plaintiffs

assert the union did not comply with its own constitutional requirements and cannot fault

Plaintiffs for failing to do so.  ECF No. 40 at 49.  Plaintiffs also argue that, by allowing

Plaintiffs' appeal to go through the appeals process, the union interpreted the constitution in a

way that allowed the appeal, and the union is now precluded from making a "post-hoc"

interpretation.  ECF No. 40 at 41-2.  Alternatively, Plaintiffs assert that the union's present

interpretation of the constitution is unfair or unreasonable.  ECF No 40 at 42.

### 1.  The 35 Appellants

        Despite the signature requirement in the union constitution, and despite Dragomier being

the only Plaintiff to have personally signed all appeal documents, the record is replete with

evidence that throughout the process, Plaintiffs, Strickland, the union, the IEB and the PRB all

believed that Dragomier was representing all 35 appellants.  ECF No. 40 at 22-34.  Dragomier, in

material presented to the appeals board, repeatedly refers to "our group" and "all the Grievants in

14

(4:11cv862)

this case"[13]  (ECF No. 40-38 at 21), as well as testifying to the IEB that "he went to Shop

Chairperson Ben Strickland regarding their seniority dates and to file two grievances on his

behalf and the behalf of the other 34 temporary employees that were laid-off in April 2007 and

rehired in November 2007."  ECF No. 22-7 at 7.  The IEB decision states, "Ben Strickland

testified the Appellants appealed his decision to not write their grievances to the UAW Local

1112 membership at a membership meeting held on March 8, 2009[;] the membership denied

their appeal."  ECF No. 22-7 at 13.

Plaintiffs attest they "decided that [Dragomier] would represent a large group of us in

asking the union to file a grievance on our behalf"; "[a]ll communications with the union and our

group went through Mark Dragomier"; and "Mark Dragomier filed an appeal for the entire

group."  *E.g.*, ECF No. 40-20 at 1.  Each Plaintiff stated that he or she contributed to the

retention of the attorney they had hired.  *E.g.*, ECF No. 40-20 at 2.  The "group was commonly

referred to as 'the infamous 35' or '35' by Ben Strickland, other union representatives, and co-

workers."  ECF No. 40-22 at 2.

The IEB and PRB decisions contain statements such as: "On October 16, 2006, sixty-two

(62) temporary employees were hired on a temporary basis with Mark Dragomier being one of

such temporary employees, hereinafter referred to as the Appellants," and "GM rehired the 35

appellants in this case in November, 2007."  ECF Nos. 22-7 at 2; 22-6 at 4.  The "Brief of Mark

Dragaomier and All Other Grievants," submitted to the PRB by Plaintiffs' then-attorney, begins,

---

[13]  Defendants argue that Dragomier referred to himself in the singular, "my" and "I," in
his material presented to the board.  ECF Nos. 20-1 at 11; 21-1 at 22; 22-1 at 5.  Though true, the
material also refers to plurals, as noted above.

15

(4:11cv862)

> I know I do not have to remind this Board of the Union's duty of fair
> representation. But a short review is in order.  In *Vaca v. Sipes*, the Court held that
> exhaustion of exclusive contract remedies is required as a prerequisite to a Section
> 301, LMRA action by an employee against either the Union or the employer.  And
> so the Grievants are doing what is required to get redress with the hope that it will
> be unnecessary to bring suit under Section 301.  (internal citations omitted)

ECF No. 40-38 at 2.  Clearly, the interested parties all understood all Plaintiffs were participating

in the internal appeals process and were therefore on notice that there were 35 appellants.[14]

## 2.  Reliance upon Representations

Local 1112 argues that Plaintiffs are relying upon representations or misrepresentations of

union officials as an excuse for failing to comply with the internal union appeal process, citing

*Adkins v. United Mine Workers of Am.*, 1995 WL 441630 (6th Cir. July 25, 1995) in support.

ECF No. 43 at 15-18.  In *Adkins*, the workers did not exhaust internal remedies after the union

prevented them from joining a strike despite the workers signing up for strike duty.  1995 WL

441630, at *1, 7.  The workers filed a lawsuit arguing they were excused from exhausting

internal remedies because local union members had assured them that the union was representing

their interests during the strike.  *Id.*  That Court, after noting that the plaintiffs provided no

evidence to indicate that any of them followed or attempted to follow the written appeals process

to protest the actions of the union, found that the representations by the union to the workers

neither satisfied nor eliminated the exhaustion requirement.  *Id.*

---

[14]  Defendants argue the appeals boards could not dismiss Plaintiffs because the boards
could not know they were parties to the proceedings, and therefore there was no reason to seek
their dismissal.  ECF Nos. 43 at 19; 42 at 7; 44 at 11.  As noted, however, the boards knew
perfectly well that there were 35 appellants, that the 35 appellants were the employees rehired in
November 2007 (ECF No. 22-6 at 4), and could have dismissed all but one or four if it had
wanted to do so.

(4:11cv862)

*Adkins* is not on point with the instant case.  In the instant case, Plaintiffs present

evidence that they reasonably believed they followed and did substantially follow the internal

appeals process.  The additional cases Local 1112 cites all involve plaintiffs who did not attempt

to follow administrative remedies because a union official told them they did not need to do so.[15]

ECF No. 43 at 16-18.  There is nothing in the record to suggest that Plaintiffs did not exhaust

their internal remedies because a union official told them they did not need to do so.  Rather,

Plaintiffs substantially complied with the internal remedies, believed they were complying with

the internal remedies, and such belief was continually affirmed by appeal board opinions that

indicated the appeals boards believed Plaintiffs were complying with the internal remedies.

### 3. Interpretation of the Union Constitution

Plaintiffs allege that the union constitution is "silent on the issue of group or

representative appeals."  ECF No. 40 at 7.  Plaintiffs argue the union interpreted its constitution

in a way that allowed Dragomier to represent the other Plaintiffs throughout the appeals process

and is now "estopped from claiming otherwise at this stage of proceedings."  ECF No. 40 at 46.

The union Defendants agree the constitution does not explicitly provide for a group

appeal, but argue that Article 33, section 3(d), which sets forth the procedure for IEB appeals,

uses the word "member(s)" when requiring a signature, thus "clearly requir[ing] all members

---

[15]  In addition to *Adkins*, Local 1112 cites:  *Hammer v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 178 F.3d 856, 858 (7th Cir. 1999); *Newgent v. Modine Mfg. Co.*, 495 F.2d 919 (7th Cir. 1974) overruled on other grounds by *Rupe v. Spector Freight Sys., Inc.*, 679 F.2d 685 (7th Cir. 1982); *Miller v. General Motors Corp.*, 675 F.2d 146 (7th Cir. 1982); *Ryan v. Gen. Motors Corp.*, 929 F.2d 1105, 1110 (6th Cir. 1989); *Rogers v. Bd. of Educ. of Buena Vista Sch.*, 2 F.3d 163 (6th Cir. 1993); and *Jarrel v. Bomag*, 728 F.Supp. 468 (S.D. Ohio 1989).

17

(4:11cv862)

who wish to appeal to sign the appeal." ECF Nos. 20-1 at 13; 22-1 at 14; 43 at 7-8.[16] Be that as

it may, the language does not specifically address group or representative appeals, nor does any

other section in the constitution. Furthermore, the Court notes that the constitution is

inconsistent in its use of singular and plural— the section setting forth the signature requirement

for appeals to the PRB uses the singular, "appellant." ECF No. 22-8 at 92. UAW appears to

suggest a group appeal may not be permitted at all. ECF No. 22-1 at 14. Because it is not clear

from the constitution whether a group appeal is permitted, and, if so, what procedures are

required, the Court relies upon the factual record to determine whether the union interpreted its

constitution to allow a group appeal, as Plaintiffs allege. *See Wilson v. Int'l Bhd. of Teamsters,*

*Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO*, 83 F.3d 747, 752 (6th Cir. 1996)

(inquiry as to whether employee filed a group grievance is fact specific).

As noted, the record reflects the appeals board repeatedly referred to the group in its

decisions; the IEB and PRB decisions captioned "Mark Dragomier, et al"; and the IEB decision

named four Plaintiffs as "appellants" making "appearances." ECF Nos. 22-7 at 1; 22-6 at 1.

---

[16] Local 1112 also asserts Plaintiffs should be precluded from asserting "waiver" because they failed to plead so in their Complaint. ECF No. 43 at 15. Plaintiffs pleaded they had exhausted internal remedies (ECF No. 1 at 5), and it was upon the motions filed by Defendants challenging the exhaustion requirement that Plaintiffs asserted an argument Defendant Local 1112 calls "waiver." ECF No. 43 at 15. In any event, the case law cited by Local 1112 is not persuasive or on point. Local 1112 cites *Sedlarik v. General Motors Corp.*, 54 F.R.D. 230, 233 (W.D. Mich. 1971) ("it is incumbent upon the plaintiff as a condition to his seeking relief in this court to plead affirmatively that he has either exhausted his remedies . . . or to plead facts in avoidance of that obligation showing such procedures would be futile); *Gardner v. The Int'l. Union, United Automobile, Aerospace and Agricultural Implement Workers of Am.*, 1974 WL 1135, at *2 (E.D. Mich. Aug. 23, 1974) (same, citing *Sedlarik*). ECF No. 43 at 15. As noted, Plaintiffs pleaded affirmatively that they had exhausted their internal remedies.

(4:11cv862)

GM speculates that the three additional Plaintiffs who testified at the IEB hearing were named by IEB in the caption only because "the IEB erred on the side of caution and included them." ECF No. 21-1 at 22 n.9.  The Court finds it difficult to believe that throughout the appeals process the boards would simply guess as to whom the parties were, or feel the need to exercise caution in naming them.  The union constitution provides no mechanism for changing or adding parties to an appeal once the process begins at the initial step (ECF No. 22-1) — yet the IEB decision included named appellants that Defendants allege were not properly included in that initial step, and continued to refer to appellants as a group.  The IEB had the authority to dismiss appeals when, for example, the members failed to attend the hearings thereby violating provisions of the constitution.  ECF No. 40 at 14.  The PRB "shall formulate such rules of procedure and establish such practices as are necessary to facilitate its proper functions."  ECF No. 22-8 at 85.  It "shall establish its own rules of procedure including those governing the extent and scope of hearings."  ECF No. 22-8 at 93.  Surely such scope and procedure would include a determination as to who the parties to the process are, or attempts at clarification if necessary.

Given that the parties in the appeals process reasonably believed Plaintiffs were participating in that process, it cannot be said, as a matter of law, that Plaintiffs failed to exhaust these remedies.  In *Wilson*, a Sixth Circuit group grievance case, the plaintiffs argued that an employee's grievance taken through the required grievance procedure was a group grievance and covered the additional five plaintiffs bringing the lawsuit.  83 F.3d at 752.  To determine whether there had been a group grievance, the district court, after noting the CBA did not address the issue, considered extrinsic evidence of past practices to determine whether group grievances

19

(4:11cv862)

were permissible pursuant to the CBA. *Id*. The evidence revealed that group grievances had been allowed in the past, but only where the grievance was filed by a union steward, or where all members of the group personally signed the grievance. *Id*. After considering all the evidence presented, the district court found that the grievance filed by Wilson did not qualify as a group grievance. *Id*. The Sixth Circuit affirmed "after a careful review of the facts," finding most persuasive "the fact that none of the dismissed plaintiffs signed the grievance allegedly filed on their behalf. Indeed, at least one did not even know that a grievance had been filed until long after the grievance process had begun." *Id*. at 752-53.

UAW argues that "the only difference between the facts in *Wilson* and in this case" is that *Wilson* dealt with a grievance filed pursuant to a CBA, whereas the instant case involves a union constitution. ECF No. 22-1 at 13. Though it is correct to say *Wilson* dealt with a CBA grievance, it cannot be said that is the only distinguishing fact. The *Wilson* court, after noting the district court thoroughly reviewed the extrinsic evidence submitted and that it did the same, did not divulge the facts presented and considered. The instant Court is therefore not acquainted with facts presented to the *Wilson* court that may inform its analysis as to a determination of Plaintiffs' group grievance. It is clear the inquiry was fact specific and supplemented with extrinsic evidence regarding past practices of group grievances. No party to the instant case asserts there were past practices of group grievances that would serve to determine the validity of this one, and the Court assumes there have not been any.

In sum, Plaintiffs present evidence establishing a genuine issue of material fact as to whether the union interpreted its constitution in such a way that allowed Plaintiffs' grievance to

20

(4:11cv862)

proceed as a group grievance, filed by Dragomier, on behalf of himself and 34 appellants.

### IV. Conclusion

For the reasons stated above, the Court denies Defendants' Motion for Summary

Judgment on Threshold Legal Issues. ECF Nos. 20; 21; 22.


IT IS SO ORDERED.


  December 29, 2012                          /s/ Benita Y. Pearson
Date                                         Benita Y. Pearson
                                             United States District Judge