PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| MARK DRAGOMIER, *et al.*, | ) | |
| | ) | CASE NO. 4:11cv862 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| LOCAL 1112 INTERNATIONAL UNION | ) | |
| UNITED AUTOMOBILE AEROSPACE | ) | |
| AND AGRICULTURAL IMPLEMENT | ) | |
| WORKERS OF AMERICA, *et al.*, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** [Resolving ECF Nos. 74; 76; 77; |
| Defendants. | ) | 78; 98] |


Pending before the Court are a Motion for Partial Summary Judgment filed by Plaintiffs

Mark Dragomier, Buffy Bell, Joseph Booth, Cheryl Brenner, Michael Bury, Robert Carr, Dan

Clark, Edward Davis, Walter Dombrowski, Jr., Rodney Fowler,[1] Juliann Golembowski, Sean

Harrison, Christina Haynes, Shanna Hodge-Cargill, Neema Books, Lynette Huston, Michael

Javornicky, Deborah Keirsey, Amy Lapushansky, Amy Lattimer, Darlene Lee-Howie, Deanna

Long, Tiffany Lowery, Franko Mancini, Denise Perry, Sonya Scott, Patrick Vrontos, and Mary

K. Wood (ECF No. 74), Motions for Summary Judgment filed by Defendant Local 1112

International Union United Automobile, Aerospace and Agricultural Implement Workers of

America (ECF No. 76), Defendant International Union United Automobile, Aerospace and

---

[1] Plaintiff Rodney Fowler passed away during the pendency of this case.  ECF No. 45.
Fowler's estate has been substituted as party plaintiff.  ECF No. 52.

(4:11cv862)

Agricultural Implement Workers of America (ECF No. 77), and Defendant General Motors, LLC

(ECF No. 78), and Plaintiffs' Motion to Substitute Party (ECF No. 98).  The Court has been

advised, having reviewed the record, including the parties' briefs and the applicable law.  For the

reasons provided below, the Court hereby grants Defendants' Motions for Summary Judgment,

denies Plaintiffs' Motion for Partial Summary Judgment, and denies as moot Plaintiffs' Motion

to Substitute Party.

## I.  Factual Background

### A.  The Parties

Plaintiffs are a group of 28 employees of General Motors, LLC (GM) who work in

various departments in GM's Lordstown Complex East Assembly Plant in Lordstown, Ohio.

ECF No. 69 ¶ 4.  The Local 1112 International Union United Automobile, Aerospace and

Agricultural Implement Workers of America ("Local 1112") and International Union United

Automobile, Aerospace and Agricultural Implement Workers of America ("International UAW")

(collectively, "Unions") are labor organizations and the bargaining representatives of GM

employees working at the Lordstown Plant, including Plaintiffs.  ECF No. 69 ¶ 5.  Plaintiffs,

Local 1112, International UAW, and GM were all subject to the terms and conditions of the

collective bargaining agreements between General Motors Corporation and the United Auto

Workers, dated September 18, 2003 (the "2003 CBA") and September 26, 2007 (the "2007

CBA").  ECF Nos. 75-1; 75-2.  The 2003 CBA provided the exclusive obligations of the parties

prior to October 15, 2007; the 2007 CBA thereafter.  ECF No. 78-1 at 10.

2

(4:11cv862)

### B.  Negotiating History

GM was financially struggling in the lead up to the 2007 CBA negotiations, and was contemplating outsourcing certain "non-core" jobs as a cost-cutting measure.[2]    ECF No. 79-35 at 16– 17.  Instead, the parties reached an agreement instituting a Two-Tier Wage Structure that provided for a lower, entry level wage to be paid to newly hired Entry Level employees.  ECF No. 79-35 at 16–17.  This allowed GM to reduce its operating costs while protecting Union jobs from being outsourced as GM had initially contemplated.  ECF No. 79-35 at 17.  GM and International UAW (the National Parties) memorialized the Two-Tier Wage Structure in the Memorandum of Understanding – UAW-GM Entry Level Wage & Benefit Agreement ("Entry Level MOU"), which became effective as part of the 2007 CBA on October 15, 2007.  ECF No. 77-1 at 11.

The Unions received push-back from its membership about the Two-Tier Wage Structure. ECF No. 79-34 at 22–23.  The more-senior members of the Union became concerned that they would not be able to transition to the preferred non-core jobs after working years in core jobs if Entry Level employees would be hired to fill non-core vacancies going forward.  ECF No. 79-34 at 23.  The National Parties continued to discuss the implementation of the Entry Level MOU in response to these concerns, and subsequently agreed to two additional documents: the Core/Non Core and Entry Level Job Assignment Clarification ("March 2008 Clarification") and the

---

[2]  "Non-core" jobs were typically those positions that did not involve working on the assembly lines.  ECF No. 75 ¶ 41.  In contrast, "core" jobs were those held by employees working on the assembly lines.  ECF No. 85 at 9.  Senior members preferred non-core jobs because they were less physically demanding than core jobs.  ECF No. 79-11 at 63.

3

(4:11cv862)

Core/Non-Core Agreement ("March 2008 Agreement")—the effect of which is subject to dispute in the instant matter.

### C.  Plaintiffs' Employment

On October 16, 2006, GM hired a number of temporary employees, including Plaintiffs, for a limited period of time.  ECF No. 75 ¶ 32.  As temporary employees, Plaintiffs had no guarantee of continued employment, nor a right to be re-employed if terminated.  ECF No 75 ¶¶ 26, 28.  By April 30, 2007, all Plaintiffs had been terminated from temporary employment at the Lordstown plant.  ECF No. 75 ¶ 33.  In November 2007, GM rehired Plaintiffs as temporary employees.  ECF No. 69 ¶ 11.

In June 2008, GM offered Plaintiffs the opportunity to become regular, Entry Level employees at Lordstown.  ECF No. 75 ¶ 42.  This entitled Plaintiffs to benefits they previously never enjoyed as temporary employees, including medical, dental, prescription and vision insurance; paid vacation and sick leave; and the ability to accrue seniority.  ECF Nos. 79-9 at 25–26; 79-34 at 35.  Plaintiffs all signed the Response to Job Offer Forms in June 2008 when presented with the option to do so.  ECF No. 75 ¶ 43.  Plaintiffs' wages decreased from the wages they previously earned as temporary employees; however, they maintained the same position along the wage progression that they had achieved as temporary employees.  ECF No. 78-1 at 28–29.

### D.  Plaintiffs' Meetings With Union Officials Regarding Entry Level Wages

At the time GM offered Plaintiffs positions as Entry Level employees, the Unions anticipated that they would return to their traditional wages after GM had hired enough new

(4:11cv862)

Entry Level employees for a planned third shift. Pursuant to the Entry Level MOU, as modified by the March 2008 Clarification and Agreement, Plaintiffs would be "bumped up" again to traditional wages after GM had hired a certain number of Entry Level employees. ECF No. 79-30 at 153. GM's continuing financial struggles led to the elimination of the third shift, which meant that Plaintiffs were not "bumped up" to traditional wages. ECF No. 79-35 at 40.

This led to dissatisfaction among the Plaintiffs, who then sought an explanation from the Unions. Between July and December 2008, Local 1112 Shop Chairman Ben Strickland held three separate meetings with various Plaintiffs about their status as Entry Level employees. ECF No. 75 ¶ 48. Several Plaintiffs also met with Strickland one-on-one. ECF No. 75 ¶¶ 132, 197, 227. Around the same time, Strickland communicated with officials of the International Union regarding Plaintiffs' situation. ECF No. 75 ¶ 49. Strickland testified that his conversations with International UAW officials had confirmed that the CBA had been properly applied to Plaintiffs and their wages. ECF No. 79-30 at 178. Nonetheless, Strickland pleaded with GM officials to return Plaintiffs' wages to the traditional rate. ECF No. 79-30 at 160. When this too failed, Strickland informed the Plaintiffs that he did not plan to file a grievance on their behalf while at the same time encouraging Plaintiffs to appeal his decision. ECF No. 79-30 at 255–56.

**E. The Internal Appeals Process**

The UAW Constitution provides for a three-level appeal process when a member believes that Union officials wrongfully declined to file a requested grievance. ECF No. 22-8 at 87. The grievant first appeals to the "membership or delegate body immediately responsible for the official, officer, action, or decision under challenge." ECF No. 22-8 at 87. If the grievant's

5

(4:11cv862)

request was denied. the grievant would then appeal to the International Executive Board ("IEB") for review.  ECF No. 22-8 at 87.  The final appeal level is the Public Review Board ("PRB"), an independent board of labor law experts.  ECF No. 22-8 at 87.  In the instant matter, Dragomier appealed Strickland's decision not to file a grievance on behalf of all Plaintiffs.  ECF No. 47 at 15–16.  At each step of the appeals process, the adjudicative body agreed with Strickland that the situation did not warrant filing a grievance.  ECF No. 78-1 at 19–20.  Thereafter, the pending litigation ensued.

## II.  Procedural Background

Plaintiffs filed a Complaint in this instant Court on April 30, 2011.  ECF No. 1.  The Court instructed the parties to address whether Plaintiffs claims were barred by either the statute of limitations or by the failure to exhaust administrative remedies (collectively, the threshold legal issues).  ECF No. 47 at 4.  Defendants moved for summary judgment on the threshold legal issues.  ECF Nos. 20; 21; 22.  Plaintiffs opposed summary judgment (ECF No. 40); Defendants replied.  ECF Nos. 42; 43; 44.  The Court issued a Memorandum of Opinion and Order on December 29, 2012, denying Defendants' motions for summary judgment.  ECF No. 47.

On October 14, 2013, Plaintiffs moved to amend their Complaint.  ECF No. 59. Plaintiffs amended their complaint to clarify "why certain actions or inactions constitute violations" and to advance new theories of liability.  ECF No. 59 at 4.  All Defendants opposed this Motion (ECF Nos. 60; 61; 62); Plaintiffs replied.  ECF No. 64.  The Court granted Plaintiffs' Motion, finding that the amendments "arise out of the same 'conduct, transaction, or occurrence' as the original claims."  ECF No. 67 at 3 (quoting Fed. R. Civ. Pro. 15(c)(1)(B)).

6

(4:11cv862)

Plaintiffs assert two claims in their Amended Complaint: (1) a hybrid § 301 action brought pursuant to 29 U.S.C. § 185 against Defendant GM for breach of the CBA and against Local 1112 and International UAW for breach of the duty of fair representation; and (2) a stand-alone duty of fair representation claim brought pursuant to 29 U.S.C. § 159 against Local 1112 and International UAW.  ECF No. 69.  Both sides then filed dispositive motions.  Plaintiff filed the pending Motion for Partial Summary Judgment.  ECF No. 74.  Defendants each moved for summary judgment as to all of Plaintiffs' claims.  ECF Nos. 76; 77; 78.  Upon request of Defendant International UAW, the Court heard oral arguments on the pending motions.  The matter is ripe for review.

### III.  Legal Standard

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also* Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

After the movant makes a properly supported motion, the burden shifts to the non-moving

7

(4:11cv862)

party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  To defeat the motion, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact.  *Id.* at 248.  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict.  *Id.*  Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)).  The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily is not sufficient to defeat a motion for summary judgment.  *Id.*

8

(4:11cv862)

# IV.  Analysis

"To recover against a union under § 301, the union member must prove both (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation." *Garrish v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am.*, 417 F.3d 590, 594 (6th Cir. 2005) (quoting *Vencl v. Int'l Union of Operating Eng'rs, Local 18*, 137 F.3d 420, 424 (6th Cir. 1998)).  "[T]he two claims are inextricably interdependent." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983).  "If both prongs are not satisfied, Plaintiffs cannot succeed against any Defendant." *Garrish*, 417 F.3d at 594.

For the reasons discussed below, the Court concludes that Plaintiffs fail to satisfy either prong necessary to prevail in a hybrid § 301 claim.  While Plaintiff's failure to establish either a breach of the collective bargaining agreement or a breach of the duty of fair representation is sufficient to grant summary judgment for the defendants, the Court believes that a full analysis of Plaintiffs' claims is warranted by the complexity of the issues presented in the pleadings.

## A. Breach of the Collective Bargaining Agreement

Basic principles of contract interpretation also guide the interpretation of a collective bargaining agreement. *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983).  Explicit language is the first place a court should look for manifestations of intent, being mindful that "[t]he intended meaning of even the most explicit language can . . . only be understood in light of the context which gave rise to its inclusion." *Id.*  "The court should also interpret each provision in question as part of

(4:11cv862)

the integrated whole." *Id.*  "Where ambiguities exist, the court may look to other words and

phrases in the collective bargaining agreement for guidance." *Id.*  "In a contract dispute,

summary judgment is permissible when the contractual language of the contract is unambiguous,

or, if the language is ambiguous, where extrinsic evidence leaves no genuine issue of material

fact and permits contract interpretation of the agreement as a matter of law." *Averill v. Gleaner*

*Life Ins. Soc.*, 626 F. Supp. 2d 756, 761 (N.D. Ohio 2009).

In their Amended Complaint, Plaintiffs allege that GM has breached the CBA nine

different ways.  *See* ECF No. 69 ¶ 49.  The Court concludes none of Plaintiffs' claims has merit,

and will address each in turn.

### 1. The April 2007 Terminations

Plaintiffs' first allegation stems from the April 2007 termination of sixteen of the

Plaintiffs in this case.[3]  *See* ECF No. 75 ¶ 23.  These sixteen Plaintiffs allege that GM breached

the CBA when GM terminated these Plaintiffs "in retaliation for a verbal fight between

[Lordstown] plant manager John Donahoe and Local 1112 Shop Chairman Ben Strickland,"

because the CBA "requires layoffs to be based on manpower and production needs."  ECF No.

69 ¶ 49(a).

Plaintiffs allege that their termination was in violation of Paragraph 56 of the CBA.

Paragraph 56 provides:

---

[3]  The following sixteen Plaintiffs are challenging the April 2007 terminations: Buffy
Bell, Joseph Booth, Cheryl Brenner, Michael Bury, Dan Clark, Mark Dragomier, Juliann
Golembowski, Sean Harrison, Christina Haynes, Lynette Huston, Amy Lapushansky, Darlene
Lee-Howie, Tiffany Lowery, Denise Perry, Sonya Scott, and Mary Wood.  ECF No. 75 ¶ 23.

(4:11cv862)

> Employees shall be regarded as temporary employees until their names have been placed on the seniority list.  There shall be no responsibility for the reemployment of temporary employees if they are laid off or discharged during this period.  However, any claim by a temporary employee rehired pursuant to Paragraph (64)(e), or any claim by any other temporary employee made after 30 days of employment, that their layoff or discharge is not for cause[,] may be taken up as a grievance.

ECF No. 75-2 at 68.  Plaintiffs submit that Strickland told a number of Plaintiffs that they had been fired as a result of a fight between Donahoe and Strickland.  Plaintiffs argue that termination in retaliation for the argument does not constitute discharge "for cause" under Paragraph 56.  ECF No. 82 at 14.

Defendants counter that this argument between Donahoe and Strickland did not motivate Plaintiffs' discharge; instead, Plaintiffs were terminated because Donahoe had received orders to run the Lordstown plant more efficiently.  Defendants further argue that because GM terminated Plaintiffs in relation to fluctuations in manpower demands, Plaintiffs were not entitled to the grievance described in Paragraph 56 because the National Parties had agreed not to allow employees to grieve manpower terminations.  ECF No. 75-2 at 501 ("[Paragraph 56], of course, is not applicable to any employee laid off due to fluctuations in manpower requirements.").

During their depositions, Donahoe and former Lordstown Personnel Director Gerald Butler both testified that Donahoe did not have the unilateral authority to lay off employees like Plaintiffs suggest.  Donahoe testified that he did not have the "authority to hire locally";  instead, Donahoe submitted manpower requisitions to be approved by the manpower planning group in Detroit.  ECF No. 79-38 at 22.  Donahoe needed approval before he could take action with respect to temporary employees.  ECF No. 79-38 at 24.  Butler testified that there had not been a

(4:11cv862)

crucial need for temporary employees in April 2007, and that Donahoe was responsible to his boss for ensuring that the Lordstown plant was not employing more employees than necessary. ECF No. 81-2 at 134–35.  Thus, even if were accepted as true that Strickland had in fact told some of the Plaintiffs that a fight in April 2007 motivated Plaintiffs' termination, Strickland's statement does not create a triable issue because it does not show that Donahoe had the power to unilaterally act in the way that Plaintiffs say he did.

Defendants bolster their argument that Plaintiffs had been released for manpower reasons by offering undisputed evidence that GM terminated temporary employees prior to April 2007-- when the alleged fight occurred.  For example, Plaintiff Carr was released as a temporary employee on January 15, 2007.  ECF No. 75 ¶ 98.  Similarly, Plaintiffs Davis, Dombrowski, Javornicky, and Keirsey were released prior to April 2007.  ECF No. 75 ¶¶ 112, 120, 176, 183. This reflects a pattern of workforce reduction at the Lordstown plant preceding the alleged fight. Even setting aside Donahoe's lack of authority to unilaterally terminate Plaintiffs, the evidence reveals that the April 2007 terminations were consistent with an already-ongoing effort to reduce the number of people employed at the Lordstown plant.

Plaintiffs do not provide any evidence that contradicts GM's position that Plaintiffs had been terminated as a result of an ongoing workforce reduction at the Lordstown plant. Consequently, Plaintiffs did not have a right to grieve whether they were terminated for cause under Paragraph 56.  Accordingly, the Court concludes that GM did not breach the CBA as to the April 2007 terminations of some of the Plaintiffs in this case.  The Court grants Defendants summary judgment as to Plaintiffs' first alleged breach of the CBA.

12

(4:11cv862)

### 2. Non-bargaining Work during Summer 2007

The same group of sixteen Plaintiffs next argue that GM breached the CBA in summer 2007 when it allowed non-bargaining employees to perform bargaining work while Plaintiffs were on layoff.  ECF No. 69 ¶ 49(b).  Plaintiffs allege that these instances of non-bargaining employees performing bargaining work both amount to an independent breach of the CBA and serve as evidence that Plaintiffs' termination in April 2007 was motivated by the Donahoe-Strickland argument.  ECF No. 82 at 50–51.

The Court rejects both of Plaintiffs' positions because the CBA permitted the type of work about which Plaintiffs complain.  Paragraph 215 of the CBA prohibits supervisory employees from performing bargaining work unless an exception applies.  ECF No. 75-2 at 179–80.  Relevant to the instant dispute, Paragraph 215 permits supervisors to perform bargaining work "in emergencies arising out of unforeseen circumstances which call for immediate action to avoid interruption of operations."  ECF No. 75-2 at 180.

In this case, the only evidence submitted by Plaintiffs about non-bargaining employees performing bargaining work pertains to manpower shortages.  Robert Brenner's letter indicates that he observed "[m]anagement . . . placing two industrial engineers or two other management personnel on a single job *in order to be able to run the line*."  ECF No. 82-4 (emphasis added). Dan Brown's letter also mentions incidents from 2007 when production stopped because of a shortage of manpower.  ECF No. 82-5 (recalling "how bad it looked to the folks up north" that the plant closed early because the plant was "short handed").  Furthermore, both Strickland and Union Representative Greg Werden testified to instances during the summer of 2007 when

13

(4:11cv862)

management was forced to operate the line because an over-scheduling of vacations caused a workforce shortage.  ECF Nos. 79-30 at 128–29; 79-31 at 17.  Each of these instances fall within Paragraph 215's emergency exception.  The Court cannot conclude that GM breached the CBA by acting in accordance with an exception contained in the plain language.

Moreover, the Court rejects Plaintiffs' argument that the summer workforce shortage is probative of the fact that Plaintiffs were improperly terminated in April 2007.  As discussed above, management had terminated numerous temporary employees prior to the April 2007 layoffs.  The fact that the plant was subsequently understaffed does not change the fact that management believed that the plant had been overstaffed prior to the summer.  At most, it is probative that GM could have improved its ability to forecast manpower needs.  Additionally, the summer work shortages do not prove that Donahoe did have power to unilaterally terminate Plaintiffs.

Plaintiffs have not presented evidence that shows use of non-bargaining employees during the summer of 2007 did not comply with Paragraph 215's exception for emergencies.  The Court grants Defendants summary judgment as to Plaintiffs' second alleged breach of the CBA.

### 3. Seniority under Paragraph 57

All 28 Plaintiffs allege that GM breached the CBA by failing to recognize seniority benefits that Plaintiffs argue they obtained prior to the acceptance of permanent positions in June 2008.  Plaintiffs' first theory as to why they acquired seniority prior to June 2008 is by operation of Paragraph 57 of the CBA when they worked for more than ninety consecutive days in 2006 and 2007.  ECF No. 69 ¶ 49(c).  Paragraph 57 provides that "[e]mployees may acquire seniority

14

(4:11cv862)

by working ninety days during a period of six continuous months in which even the employee's seniority will date back ninety days from the date seniority is acquired."  ECF No. 75-2 at 68. Plaintiffs argue Paragraph 57 should have applied to them because "[c]learly plaintiffs worked more than 90 days on several occasions as temps."  ECF No. 82 at 49.

The problem with Plaintiffs' argument is that a different provision of the CBA explicitly excludes temporary employees like Plaintiffs from acquiring seniority while employed as temporaries.  Appendix A, Section VIII of the CBA governs "employees hired for temporary work."  ECF No. 75-2 at 204.  Subsection D provides that "[t]ime worked by a vacation replacement or other temporary employee who is hired pursuant to this Memorandum will not be included in the computation for acquiring seniority pursuant to Paragraph (57) and Appendix D." ECF No. 75-2 at 204–05.  Therefore, Appendix A expressly exempted temporary employees like Plaintiffs from the provisions contained in Paragraph 57.  It is uncontested that Plaintiffs had been classified as temporary employees at all times prior to June 2008.  ECF No. 75 ¶ 24. Consequently, GM properly did not apply Paragraph 57 to Plaintiffs while they were employed on a temporary basis.

The Court concludes that GM acted in accordance with, not contrary to, the provisions of Paragraph 57.  Defendants' Motions for Summary Judgment are granted as to Plaintiffs' third alleged breach of the CBA.

### 4. Seniority under Document 144

As an alternative explanation for why Plaintiffs should have obtained seniority prior to June 2008, Plaintiffs argue that they acquired seniority pursuant to Document 144 because GM

15

(4:11cv862)

did not properly extend their periods of temporary employment.  ECF No. 69 ¶ 49(d).

Document 144 provides that, "[i]n the event that a plant hires temporary employees without

National Parties [sic] approval . . . or in the event that a plant retains temporary employees past

the approved period, such employees will become seniority employees."  ECF No. 75-2 at 686.

Under the CBA, however, only the requests for temporary employment, not the approvals

themselves, need to be in writing.  ECF No. 75-2 at 204 ("*Requests* for vacation replacements

and other employees hired for temporary work shall be made in writing to the National Parties

for mutual approval.") (emphasis added).  Appendix A, Section VIII does not specify the manner

in which the written requests are approved.

        While acknowledging that Defendants properly requested extensions for the temporary

employees in writing, Plaintiffs argue that summary judgment is precluded on this issue because

of the lack of documentation conclusively establishing that GM had always properly extended

Plaintiffs' periods of temporary employment.  Plaintiffs' argument ignores the undisputed

testimony from officials from both GM and International UAW that the National Parties timely

approved each request for extension.  International UAW Assistant Director Mike Grimes

testified that it "would have been great" if the Union had caught GM violating Document 144,

but that it never happened because both the Union and GM approved Plaintiffs' periods of

temporary employment.  ECF No. 79-34 at 57–59.  Strickland testified that Plaintiffs' periods of

temporary employment "were definitely approved verbally."  ECF No. 79-30 at 91.  Both

Donahoe and Labor Relations Manager James Hackett testified that the National Parties always

gave verbal approvals for requested extensions.  ECF Nos. 79-38 at 23–24; 81-1 at 23.  Thus,

(4:11cv862)

GM, Local 1112, and International UAW—the parties participating in the approval process—all

agree that Document 144 was not triggered as to Plaintiffs.

As important, Plaintiffs have not presented any evidence showing why the Unions would

agree with GM that all periods of temporary employment had been properly approved unless it

was absolutely true.  GM observes that the Union and GM have divergent interests in seeing

Document 144 enforced.  "The Union would have every incentive to address any failure by GM

regarding requests/approvals of Temporary Employees," if such a problem existed, because

"Temporary Employees retained beyond their approval date can be converted to seniority,

Regular Employees."  ECF No. 89 at 8 n.2.  Plaintiffs speculate that "given the high stakes for

failure to approve in a timely manner—temps being converted to seniority employees—it is

strange that no written records or memorializations of approvals exist."  ECF No. 82 at 48.  Such

speculation, however, is insufficient to defeat summary judgment: "Conclusory allegations,

speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a

well-supported motion for summary judgment."  *Gooden v. City of Memphis Police Dep't*, 67

*Fed. App'x 893, 895 (6th Cir. 2003)* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888

(1990)).  Instead, the evidence before the Court leads to the conclusion that Plaintiffs' temporary

employment never triggered the provisions of Document 144.

In order to create a material fact, Plaintiffs offer "Earnings and Deductions Ledgers" as

evidence that Plaintiffs had been seniority employees prior to June 2008.  ECF Nos. 82-1; 82-2.

Plaintiffs argue the ledgers preclude granting summary judgment because they suggest GM's

payroll system recognized that Plaintiffs had obtained seniority by virtue of Document 144.  ECF

17

(4:11cv862)

No. 82 at 17.  For example, Plaintiff Scott's Ledger for 2007 displays "11-19-07" under seniority whereas Scott's Ledger for 2008 displays "6-12-08" under seniority.  ECF No. 82-2 at 1, 4.

Plaintiffs' argument falls short, however, because the "Earnings and Deductions Ledgers" are not seniority-related documents.  The undisputed evidence before the Court reveals that the Ledgers are merely payroll documents unrelated to seniority classification.  For example, GM's former General Director of Labor Relations Arthur Schwartz testified that Plaintiffs did not have seniority prior to June 2008 and explained the seniority date on Plaintiffs' Ledgers instead reflected the date that temporary employees like Plaintiff had been hired.  ECF No. 79-35 at 76.  Craig Speckmann, GM's Senior Labor Relations Manager, confirms that GM uses the same type of Ledger for both seniority and temporary employees; that there is no other space on the Ledger for reporting hiring dates; and that the date reflects hiring dates when appearing on a temporary employee's Ledger.  ECF No. 89-1 ¶¶ 4–5.  Plaintiffs' employment history confirms GM's position.  For example, Plaintiff Scott stipulated that she had been employed as a temporary employee on November 19, 2007 and had accepted an Entry Level position June 12, 2008.  ECF No. 75 ¶¶ 232–33.  These dates match the dates that appear on Scott's Ledger.  *See* ECF No. 82-2 at 1, 4.  The Ledgers are not evidence of Plaintiffs' alleged classification as seniority employees prior to June 2008.

The undisputed evidence supports Defendants' position that all requests for extending Plaintiffs' temporary employment were timely accepted.  Consequently, the Court grants Defendants summary judgment as to Plaintiffs' fourth alleged breach of the CBA.

18

(4:11cv862)

### 5. Temporary Acknowledgment Forms

Plaintiffs' fifth alleged breach of the CBA relates to the Temporary Acknowledgment Forms that Plaintiffs signed each time they were hired as temporary employees.  Plaintiffs argue that GM forced Plaintiffs to waive "contractually-guaranteed seniority rights" each time they signed the Temporary Acknowledgment Forms.  ECF No. 69 ¶ 49(e).

The Court rejects Plaintiffs' argument because the Temporary Acknowledgment Forms comport with the plain language governing Plaintiffs' employment as temporaries.  As discussed above, temporary employees like Plaintiffs were not entitled to accrue seniority.  ECF No. 75-2 at 204–05 ("Time worked by a vacation replacement or other temporary employee who is hired pursuant to this Memorandum will not be included in the computation for acquiring seniority pursuant to Paragraph (57) and Appendix D.").  The Temporary Acknowledgment Forms used nearly identical language: *See, e.g.*, ECF No. 75-7 at 2 ("Time worked by me as a vacation replacement or other temporary employee who is hired pursuant to this Memorandum will not be included in the computation for acquiring seniority pursuant to Paragraph (57) and Appendix D.").  Moreover, the top of each Temporary Acknowledgment Form expressly signaled to each Plaintiff that GM was offering a temporary employee position, as expressly provided for in the applicable section of the CBA.[4]  Plaintiffs therefore understood precisely what they were entitled

---

[4]  For example, Plaintiff Dragomier signed a Temporary Acknowledgment Form dated 10/16/06 that stated Dragomier was hired "pursuant to the provisions of the GM-UAW National Agreement, Appendix A, Section X."  ECF No. 75-7 at 3.  This was the provision governing temporary employment in the 2003 CBA, which was in effect the date Dragomier signed the form.  ECF No. 75-1 at 109.

(4:11cv862)

to when choosing whether to accept temporary positions from GM.  Far from unilaterally

changing the terms and conditions of employment, GM was acting in accordance with the CBA

that had been negotiated between GM and International UAW.

The Court concludes that GM's Temporary Acknowledgment Forms are consistent with

the CBA's treatment of temporary employees.  Accordingly, the Court grants summary judgment

as to Plaintiffs' fifth alleged breach of the CBA.

### 6. Reclassification as Entry Level Employees

Plaintiffs argue that GM breached the CBA when GM improperly reclassified Plaintiffs

as Entry Level employees in June 2008, which in turn led to reductions in Plaintiffs' pay.  ECF

No. 69 ¶ 49(h).  Central to this claim is the relation among three documents—the Entry Level

MOU, the March 2008 Clarification, and the March 2008 Agreement.  Plaintiffs' position is that

no version of the Entry Level MOU applied to them because Entry Level positions perform non-

core work whereas Plaintiffs performed core work at all times during their employment with

GM.  Defendants counter that the March 2008 Clarification and the March 2008 Agreement

effectively modified the Entry Level MOU as it defined Entry Level employee.  For the reasons

discussed below, the Court concludes that the Entry Level MOU, the March 2008 Clarification,

and the March 2008 Agreement reflect "clear manifestations of intent" of the National Parties

that "Entry Level employees" meant every new non-temporary employee hired after the effective

dates of CBA, as modified by the March 2008 Clarification and the March 2008 Agreement.

*Yard-Man*, 716 F.3d at 1479.

At the outset, it is important to note that these three documents were successive

20

(4:11cv862)

agreements of the National Parties.  It is uncontested that the Two-Tier Wage Structure was a new concept as of 2007.  ECF Nos. 78-1 at 12; 82 at 31.  Moreover, all parties agree—although for different reasons—that the Entry Level MOU did not apply to Plaintiffs when GM hired Plaintiffs in November 2007.  ECF Nos. 74 at 5–6; 89 at 12. Finally, while the parties dispute the effect of the March 2008 Clarification and the March 2008 Agreement, it is uncontested that the two documents were the product of negotiation by the National Parties.  ECF Nos. 79-1 at 82; 79-11 at 62.   Thus, the documents need to be examined as part of a sequence of action taken by the National Parties in order to fully understand the context in which each was negotiated and the purpose each was intended to address.  *Yard-Man*, 716 F.3d at 1479 ("The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion.  The court should also interpret each provision in question as part of the integrated whole") (citations omitted).

With the above in mind, the Court first turns to the Entry Level MOU.  The Entry Level MOU had been incorporated as part of the 2007 CBA and became effective in October 2007.  ECF No. 75-2 at 304.  It defines "Entry Level employees" as "*regular* employees hired on or after the date of this Memorandum into the non-core work functions identified on Attachment A of this Memorandum."  ECF No. 75-2 at 304 (emphasis added).  By its plain language, the definition of Entry Level employees describes a subset of regular employees: those "hired . . . into the non-core work functions"—however non-core may be applied.  The definition thus distinguishes among groups of regular employees based on work function, as opposed to among groups of non-core work based on whether the employee was regular or temporary.  It did not,

21

(4:11cv862)

therefore, matter whether Plaintiffs had  performed core or non-core work in November 2007 because they were classified as temporary employees.  The Entry Level MOU was not intended to apply to temporary employees.

The undisputed bargaining history confirms this interpretation.  The Two-Tier Wage Structure was the result of negotiations that had the purpose of finding a way for GM to reduce its costs during an economic downturn.  Both GM and International UAW presented evidence that, prior to the Two-Tier Wage Structure, GM had considered outsourcing non-core jobs as a way to reduce costs.  ECF Nos. 79-33 at 89–90; 79-35 at 17.  The purpose of the negotiations was to develop a way that allowed GM to reduce its costs without eliminating permanent, regular positions.  As such, the Entry Level MOU does not address any distinction among temporary employees based on core and non-core work functions because GM was not considering eliminating *temporary* non-core positions.  This makes sense, as temporary employees had no guarantee of continued employment with GM.  *See* ECF No. 75-7 (indicating that temporary employment "may be terminated at any time").  Eliminating temporary positions would not reduce GM's costs as significantly as eliminating regular positions would.

Both the plain language of the Entry Level MOU and the bargaining history leading to its creation suggest that the National Parties intended that the Entry Level MOU addressed regular employment positions, without any regard to temporary employees.  This is significant because it reveals the National Parties' goal when the parties agreed to the terms of the March 2008 Clarification and March 2008 Agreement.  Both sides agreed that the Entry Level MOU only covered regular employees and that Entry Level employees would be defined based on non-core

22

(4:11cv862)

work functions.  The question remained how the National Parties would implement these new terms.

The March 2008 Clarification expressly answers that question: "This National Letter of Understanding will serve to clarify issues concerning the implementation of the core/non core and the entry level provisions of the 2007 National Agreement between the parties."  ECF No. 75-3 at 2.  The March 2008 Clarification expresses the intent of the National Parties to modify how Entry Level positions were filled.  As the March 2008 Clarification makes clear, both parties intended to change the Entry Level MOU to permit non-Entry Level employees to maintain their non-core positions and to allow hiring Entry Level employees to perform core work functions.  Despite Plaintiffs' assertions, this intent is manifest in the plain language throughout the March 2008 Clarification.

For example, the March 2008 Clarification states that "it was clearly understood by the parties that: '***Transitioning the workforce may result in employees working together as either an entry level or non entry level employee***.'"  ECF No. 75-3 at 2 (emphasis in original).  This sentence is superfluous under Plaintiffs' interpretation of the March 2008 Clarification.  *See Yard-Man*, 716 F.3d at 1480 ("As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises.").  If the definition of Entry Level employee remained as it had originally been contemplated in the Entry Level MOU—regular employees performing non-core work functions—then only Entry Level employees could hold non-core jobs and there would be no need to specify that two employees performing the same work may be earning different wages under the Two-Tier Wage Structure.

23

(4:11cv862)

Conversely, the disclaimer is sensible when it is understood that the parties had already agreed to hire up to a certain number of Entry Level employees to perform any type of work function, because it would then be possible, under the collective bargaining position, for a regular employee earning the Entry Level wage to work alongside a regular employee earning the traditional wage.

Furthermore, the March 2008 Clarification sets out a multi-step process by which a plant transitions its workforce to accommodate the new Two-Tier Wage Structure.  The March 2008 Clarification expressly provides for a time period in which "seniority employees remain eligible to exercise their seniority rights for non-core jobs."  ECF No. 75-3 at 2.  The National Parties would then "determine the number of non-core jobs at each facility."  ECF No. 75-3 at 2.  After the number of non-core jobs had been determined, the plant would exhaust "the existing hierarchy for job placement of seniority employees."  ECF No. 75-3 at 2.  Put another way, seniority employees could bid for desirable positions (regardless of whether the selected position performed core or non-core work functions).  "Opening(s)" for new hires are then calculated, and "the Company may hire entry level employee(s) to fill the opening(s) up to the number of non-core jobs recorded at the facility."  ECF No. 75-3 at 2.  These steps are superfluous under Plaintiffs' interpretation.  If only Entry Level employees could fill non-core work functions, then there is no need to set out a procedure transitioning the plant's workforce because all vacancies for non-core positions would be filled by a newly-hired Entry Level employee.  A transition procedure is only necessary if, as Defendants argue, the National Parties had contemplated that Entry Level employees could hold both core and non-core positions after current regular

24

(4:11cv862)

employees had selected the non-core positions they desired to keep.

Moreover, the Court notes that the March 2008 Clarification contrasts in how it defines jobs and openings. "The number non core jobs" is restricted to counting just jobs with non-core work functions. ECF No. 75-3 at 2. "Openings," however, is described generally and without limitation based on work function. ECF No. 75-3 at 2. As evidenced by the "non core jobs" language, the parties were capable of limiting terms to only non-core work functions in the March 2008 Clarification when they wanted to. If, as Plaintiffs suggest, the parties had intended to hire Entry Level employees only for non-core openings, the parties could have so specified. Their choice not to suggests deliberate purpose. The same can be said for the procedure for raising an Entry Level employee to traditional wages. The March 2008 Clarification provides, in pertinent part:

> In the event an opening occurs for a new hire and the existing hierarchy for job placement of seniority employees has been exhausted for that facility and the number of entry level employees currently working at the facility equal the number of non core jobs identified at that location, the Company may hire a new entry level employee and the most senior entry level employee will transition to traditional employee status, as established in the 2008 National Agreement.

ECF No. 75-3 at 2. Again, the March 2008 Clarification's express language distinguishes between (generally) "opening" and (specifically) "non core jobs." The language in the March 2008 Clarification, therefore, suggests the National Parties deliberately intended for all openings—not just non-core openings—to be filled by Entry Level employees.

Perhaps the strongest evidence of the National Parties' intent to depart from the Entry Level MOU's definition of non-core work functions in the March 2008 Clarification is contained

(4:11cv862)

at the end of the document.  The last bullet point states that "[d]uring the transition period identified above, the assignment of *entry level and/or traditional employees to core and/or non core jobs* will be determined by the local occupational grouping agreement."  ECF No. 75-3 at 2 (emphasis added).  With this language, the March 2008 Clarification expressly contemplated that it would be possible for Entry Level employees to perform core jobs.  There is no way to reconcile this language with Plaintiffs' argument that "Entry Level employees" could only be hired to perform non-core work.

The March 2008 Agreement was the last document that the National Parties used to implement the Entry Level MOU.[5]  By its plain language, the March 2008 Agreement contemplates counting non-core positions for determining how many Entry Level employees may be hired at a plant.  This is consistent with the procedure described in the March 2008 Clarification, wherein the National Parties agreed that GM could hire Entry Level employees "to fill the opening(s) up to the number of non core jobs recorded at the facility."  ECF No. 75-3 at 2.  The March 2008 Agreement provides the exact number that the March 2008 Clarification referenced. ECF No. 75-4 at 4.

Again, the history surrounding the negotiations of the March 2008 Clarification and

---

[5]  The Court notes that the Core/Non-Core Agreement also contains indicia of the National Parties' intent to change the implementation of "Entry Level employee" and "non-core" in the Entry Level MOU.   ECF No. 75-4.  The first bullet point provides: "The initial number of Non-Core Employees that may be hired at each location (excluding SPO where all such jobs are deemed non-core) has been agreed to by the joint National Parties and is based upon the Non-Core work functions identified at each facility by the National. Parties."  ECF No. 75-4 at 2.

(4:11cv862)

March 2008 Agreement confirms Defendants' interpretation of the Entry Level MOU.

Defendants offer uncontested evidence that the original concept of core and non-core work

received push-back from senior members of the Union who were concerned about the prospect of

losing more desirable jobs to newer, lower-wage employees.  Strickland and Grimes both

testified that seniority employees complained that "after 30 years worth of working for General

Motors . . . all of a sudden the national parties were agreeing to give [non-core] jobs away to a

lower paying member."  ECF No. 79-30 at 146; *see also* ECF No. 79-34 at 22–23.  Schwartz

testified that the Union brought the seniority employee's concerns to GM's attention, and that

this push-back ultimately led to the March 2008 Clarification and March 2008 Agreement.  ECF

No. 79-35 at 18–19.  Moreover, many of the Plaintiffs conceded that they understood the

seniority employees' concerns about the original concept of non-core work.  ECF Nos. 79-11 at

63; 79-18 at 50; 79-19 at 70.  It follows, given this background, that the National Parties would

design the Two-Tier Wage Structure in a way that allowed existing, non-Entry Level employees

the ability to perform non-core work instead of solely filling the desired positions by Entry Level

employees.  The CBA—providing that non-core jobs could be filled by either Entry Level or

traditional employees—does just that.

 Plaintiffs do not present evidence to contradict Defendants' position that the March 2008

Clarification and March 2008 Agreement effectively modified what constitutes non-core work

for purposes of defining an Entry Level employee.  Instead, Plaintiffs argue that the March 2008

Clarification and March 2008 Agreement needed to "explicitly" state that the definition of non-

core work had been changed, something the National Parties did not do until May 2009.

27

(4:11cv862)

Plaintiffs, however, have provided no support for the proposition that the National Parties were under an obligation to choose express language redefining Entry Level employee rather than modifying the term's implementation through the March 2008 Clarification and March 2008 Agreement.  As previously discussed, the March 2008 Clarification and March 2008 Agreement unambiguously describe a process by which Entry Level employees may be hired by GM for openings regardless of the position's designation as core or non-core.  Both GM and International UAW—the parties to the CBA—were in agreement about the March 2008 Clarification and March 2008 Agreement's effect on the Entry Level MOU and did not see a problem with how they were written.  ECF No. 79-35 at 38.

At best, Plaintiffs' argument suggests that the March 2008 Clarification and March 2008 Agreement are ambiguous as to their effect on the Entry Level MOU by omitting explicit superseding language.  The Court, however, "hesitate[s] to disagree with the interpretation agreed upon by both parties to the Agreement—the Union and the Company—at least where, as here, the Agreement is ambiguous on its face and the parties acted on their interpretation before the issue became a subject of litigation." *Bagsby v. Lewis Bros. of Tennessee*, 820 F.2d 799, 802 (6th Cir. 1987).  Therefore, the Court rejects Plaintiffs' argument to the extent it suggests, that in hindsight, the agreements could have been drafted better because the National Parties acted in accordance with their understanding of the Entry Level MOU as modified by the  March 2008 Clarification and March 2008 Agreement.

The Court concludes that the March 2008 Clarification and March 2008 Agreement effectively modified the Entry Level MOU to allow GM to hire regular, Entry Level employees

28

(4:11cv862)

to perform core work functions.  Consequently, Plaintiffs were properly hired pursuant to the Entry Level MOU.  The Court grants summary judgment as to Plaintiffs' sixth alleged breach.

### 7. Response to Job Offer Forms

Plaintiffs next allege that the Response to Job Offer Forms that they "were forced to sign as a condition of their continued employment" constituted unlawful unilateral change to Plaintiffs' terms and conditions of employment.  ECF No. 69 ¶ 49(f).  The Court finds this allegation has no merit.  First, it is undisputed that both International UAW and GM agreed to the 2007 CBA.  *See* ECF No. 75-2 at 2.  The Entry Level MOU was incorporated as part of the 2007 CBA.  ECF No. 75-2 at 304.  Likewise, International UAW participated in the creation of both the March 2008 Clarification and March 2008 Agreement, as evidenced by the signatures appearing at the bottom of each letter of understanding.  ECF Nos. 75-3 at 2; 75-4 at 3.  As previously discussed, the Court concluded that the March 2008 Clarification and March 2008 Agreement did in fact modify how the National Parties applied the terms "Entry Level employee" and "non-core" work.  Plaintiffs' Response to Job Offer Forms were created in accordance with each of these documents.  Therefore, the Response to Job Offer Forms were not unilateral changes to Plaintiffs' terms and conditions of employment because International UAW agreed to the provisions of the CBA pursuant to which the forms were created.

Accordingly, the Court concludes that GM did not breach the CBA as to the Response to Job Offer Forms.  The Court grants Defendants summary judgment as to Plaintiffs' seventh alleged breach of the CBA.

29

(4:11cv862)

### 8. Wage Progression under Paragraph 98

Plaintiffs next argue that GM breached the CBA when it stopped paying Plaintiffs pursuant to the Wage Progression under Paragraph 98 and began paying Plaintiffs pursuant to the Wage Progression contained in the Entry Level MOU. ECF No. 69 ¶ 49(g). The Court likewise rejects this argument because GM acted in accordance with the plain language of the Entry Level MOU with respect to Plaintiffs' wages.

The Entry Level MOU states "Except as otherwise specified in this Memorandum, employees hired after the effective date of this Memorandum will be covered in all respects by the UAW-GM 2007 National Agreement." ECF No. 75-2 at 304. "Otherwise specified" in the Entry Level MOU is a new Wage Progression for Entry Level employees. Under the Entry Level MOU:

> For all production employees hired after the Effective Date of this Memorandum, new hire rates shall be established at the greater of (a) $14.00 per hour, or (b) 90% of the prevailing Production Rate for the respective classification. Employees hired at the 90% level will receive four wage progression increases, one every 26 weeks in an amount equal to 2.5% of the then-prevailing Production Rate, until reaching the Production Rate for the relevant classification over the course of 104 weeks.

 ECF No. 75-2 at 304.

Plaintiffs signed their Response to Job Offer Forms in June 2008—eight months after the effective date of the Entry Level MOU and three months after the effective date of the March 2008 Clarification and March 2008 Agreement. ECF No. 75-6. Moreover, it is uncontested that Plaintiffs were paid in accordance with the Wage Progression contained in the Entry Level MOU after they accepted Entry Level positions with GM. ECF Nos. 74 at 6 ("The Entry Level

30

(4:11cv862)

Agreement also set forth pay rates for 'entry level' hires depending on which of the three classifications their job descriptions fit."); 74-3 ("When I was hired as a permanent employee in June, 2008, my hourly wages dropped from Est. 20.00 to Est. 14.51 because I was considered by GM to be 'entry level' when I was hired permanently.").

Plaintiffs nonetheless maintain that GM violated Paragraph 98 because Plaintiffs' wages decreased after they accepted Entry Level positions. This argument misconstrues the guarantees of the Wage Progression provisions contained in the CBA. As GM observes, neither Paragraph 98 nor the Entry Level MOU guarantee a specific wage amount. ECF No. 78-1 at 28–29. Rather, employees earn a wage based upon their position within the applicable Wage Progression. The position is determined by the employee's length of employment with GM. ECF No. 75-2 at 102 (Paragraph 98), 306 (Entry Level MOU). Thus, the decrease in wage *amount* does not prove that there was a violation of a contractually-guaranteed wage *progression*.

GM paid Plaintiffs pursuant to the Wage Progression described in the Entry Level MOU. This was in accordance with, rather than in violation of, the CBA. The Court grants summary judgment as to Plaintiffs' eighth alleged breach.

### 9. Delphi Flowback

Plaintiffs' final alleged breach of the CBA pertains to the hiring of former Delphi employees pursuant to the "Special Employee Hiring Opportunities" Administrative Guidelines. ECF No. 69 ¶ 49(I). Plaintiffs argue that GM breached the March 2008 Clarification by not bumping Plaintiffs up to traditional wages after a sufficient number of Delphi employees began working at the Lordstown plant. ECF No. 82 at 27. Plaintiffs' argument fails, however, because

31

(4:11cv862)

the Delphi employees hired at the Lordstown plant were not "Entry Level employees" within the meaning of the Entry Level MOU.

The "Special Employee Hiring Opportunities" Administrative Guidelines detail the procedures by which Delphi employees could apply for positions at GM facilities.[6]  The Guidelines provides that job offers must be made in accordance with Appendix A and Appendix K of the 2007 GM-UAW CBA.  ECF No. 82-3.  Appendix A outlines a procedure for placement into permanent traditional openings.  ECF No. 75-2 at 193.  In the event that openings remain after the application of the placement procedure, Appendix A provides that job offers may "be made in accordance with any Special Agreements."  ECF No. 75-2 at 194.  Appendix A also gives the power to the National Parties to "mutually agree to deviate from the above order of selection in a particular situation."  ECF No. 75-2 at 194.

Here, GM acted pursuant to Appendix A and the Delphi "Special Employee Hiring Opportunities" Administrative Guidelines by hiring Delphi flowback employees at traditional wages rather than promoting Plaintiffs.  GM was authorized to do so under Appendix A's explicit language.  The Delphi flowback did not count against the number established in the March 2008 Agreement because the Delphi flowback employees were not hired as Entry Level employees hired pursuant to the Entry Level MOU.

Appendix K, section II(c) of the CBA provides that GM shall replace a vacancy created

---

[6]  GM indicates that the "Special Employee Hiring Opportunities" Administrative Guidelines is a product of the relationship between Delphi and GM.  GM states that Delphi spun off from GM in 1999.  ECF No. 89 at 20.

(4:11cv862)

by a traditional employee by "allow[ing] an inplant Entry Level employee from the facility to become a Traditional employee."  ECF No. 75-2 at 228.  The Entry Level MOU expressly states, however, that "Appendix K is not applicable to employees covered by this Memorandum."  ECF No. 75-2 at 310.  By its plain language, the Entry Level MOU exempts Entry Level employees from Appendix K, including the provision requiring GM to fill traditional vacancies with in-plant employees.  Plaintiffs cannot argue the flowback violated Appendix K because Plaintiffs were not entitled to the spots filled by the Delphi flowback employees.

The undisputed evidence reflects that GM complied with all requirements contained in when the Delphi employees flowed back to the Lordstown plant.  Therefore, the Court grants Defendants summary judgment as to Plaintiffs' ninth alleged breach.

### B. Breach of the Duty of Fair Representation Under 29 U.S.C. § 185

The Court concludes that Plaintiffs cannot demonstrate that GM breached the CBA.  This alone is fatal to Plaintiffs' hybrid § 301 claims.  *See Garrish*, 417 F.3d at 594 ("If both prongs are not satisfied, Plaintiffs cannot succeed against any Defendant.").  As an alternative ground for granting Defendants summary judgment on Plaintiffs' hybrid § 301 claims, the Court concludes that Plaintiffs cannot demonstrate that either Local 1112 or International UAW breached the duty of fair representation owed to Plaintiffs.

"The duty of fair representation requires a union 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 619 (6th Cir. 2010) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)).

33

(4:11cv862)

A union breaches this duty of fair representation when the union's conduct is arbitrary, discriminatory, or in bad faith.  *Id.*  Each factor is a separate inquiry when determining whether a union violated its duty of fair representation.  *Id.*  "In order to successfully defend against a motion for summary judgment on a duty of fair representation claim, the plaintiff must point the court to evidence in the record supporting at least one of these elements."  *Id.*  Moreover, the duty of fair representation is governed by the same standard without regard to whether the plaintiffs allege a breach of the duty of fair representation as part of a hybrid § 301 action under 29 U.S.C. § 185 or as a stand-alone claim under 29 U.S.C. § 159.  *See Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 80–81 (1989) ("Our reasoning in *Vaca* in no way implies, however, that a fair representation action requires a concomitant claim against an employer for breach of contract"); *Burkholder v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am., Local No. 12*, 444 F. Supp. 2d 817, 821 (N.D. Ohio 2006) (applying the "arbitrary, discriminatory, or in bad faith" standard in a non-hybrid § 301 duty of fair representation action).

A union acts in an arbitrary manner if "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational."  *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)).  Mere negligence, ordinary mistakes, errors, or flaws in judgment will not satisfy the arbitrary standard; "an unwise or even an unconsidered decision by the union is not necessarily an irrational decision."  *Id.*  (quoting *Walk v. P*I*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir. 1992)).

34

(4:11cv862)

In order to prevail, a plaintiff must prove that the union's conduct was "wholly irrational." *O'Neill*, 499 U.S. at 78.

A union acts in a discriminatory manner if its conduct is invidious, or "based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus." *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1359–60 (10th Cir.1994). Personal animus will not suffice to show discriminatory conduct. *Gray v. Champion Int'l Corp.*, 134 F.3d 371 (6th Cir. 1997). To establish discriminatory animus, a plaintiff needs to "adduce substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of Street, Electric Railway & Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 301 (1971).

Finally, a union acts in bad faith if "it acts with an improper intent, purpose, or motive . . . encompass[ing] fraud, dishonesty, and other intentionally misleading conduct." *Merritt*, 613 F.3d at 619. The Supreme Court has suggested that the union representative must have been aware that the statements were false at the time they were made in order to constitute fraud. *Vallance v. Serv. Employees' Int'l Union, Dist. 1199*, 2011 WL 5024411, at *8 (E.D. Ky. Oct. 20, 2011); *see also Humphrey v. Moore*, 375 U.S. 335, 348 (1964) ("[T]here is no substantial evidence of fraud, deceitful action or dishonest conduct. Priddy's early assurances to Dealers employees were not well founded, it is true; but Priddy was acting upon information then available to him . . . ."). Thus, "if allegations of bad faith are based on comments made by a union representative, the *subjective* intent of the union representative is the relevant consideration." *Vallance*, 2011 WL 5024411 at *8 (emphasis added).

(4:11cv862)

Here, Plaintiffs have advanced five theories of how the Union defendants breached their duties of fair representation owed to Plaintiffs: (1) the Unions failed to investigate or grieve Plaintiffs' claims; (2) the Unions failed to advise Plaintiffs that the Temporary Acknowledgment Forms waived contractually guaranteed rights; (3) the Unions failed to advise Plaintiffs about the Response to Job Offer Forms and failed to provide Plaintiffs with representation at the meetings during which Plaintiffs accepted permanent employment; (4) the Unions materially misrepresented the likelihood of Plaintiffs' wages returning to traditional levels after accepting permanent employment; and (5) the Unions failed to keep proper records and withheld records before, during, and after the internal appeals process.  ECF No. 69 at 20.  The Court shall address each in turn.

### 1. Failure to Investigate

Plaintiffs first argue that the Union defendants have breached their duty of fair representation by failing to file the requested grievances on behalf of Plaintiffs.  ECF No. 74 at 20–21.  Plaintiffs, however, cannot meet the high standard for showing a breach of the duty of fair representation by either Union because they have not "establish[ed] by substantial evidence that the union acted arbitrarily, discriminatorily or with bad faith." *Blake v. Potter*, 247 Fed. App'x 673, 676 (6th Cir. 2007); *Summers v. Keebler Co.*, 133 Fed. App'x 249, 253 (6th Cir. 2005).

"A union's decision to not process a grievance . . . is not grounds for claiming the union breached its duty if it is based on a good faith determination that the grievance is without merit." *Haupt v. Michigan Bell Tel. Co.*, 599 F. Supp. 265, 268 (E.D. Mich. 1984).  Here, it is

36

(4:11cv862)

undisputed that Union officials took a number of steps with respect to Plaintiffs' wages following their acceptance of permanent, Entry Level positions.  When asked whether Strickland spoke with anybody at GM or International UAW about Plaintiffs earning a traditional wage as permanent employees, Strickland testified:

> As things progressed, I didn't only make it to them, I made it to the manufacturing manager, which was Larry Zahner; I talked to the international, me and John Mohan had many conversations; I turned around and took it to [UAW national servicing representative] Lee Jones; I talked to [UAW Vice President] Cal Rapson, and I talked to Mike Grimes; I talked to [head of labor department] Ruth Fluegge; I  talked to [corporate labor representative] Sam Kuper; I talked to [corporate labor representative] Ireland; I talked to one of the CEOs, which was Fritz Henderson. I talked to everybody.

ECF No. 79-30 at 160.  Grimes corroborated Strickland's testimony that members of Local 1112 communicated dissatisfaction about the entry level wages, and that Grimes himself investigated the applicable contract language.  ECF No. 79-34 at 36–37.  Moreover, it is uncontested that Strickland advocated for Plaintiffs' wages to return to traditional levels despite the fact that there was no contractual basis for requiring GM to do so.  ECF Nos. 79-30 at 184; 79-34 at 45–46.  And when these efforts did not work, Strickland held three meetings with various Plaintiffs to inform them of the steps the Union took in an attempt to convince GM to return Plaintiffs to traditional wages.  ECF No. 79-30 at 239, 243.  Finally, Strickland explained to Plaintiff Dragomier that Strickland would not file a grievance on behalf of Plaintiffs while at the same time explaining to Dragomier how to appeal his decision in the event that "[Strickland] could have missed something."  ECF No. 79-30 at 255.  Plaintiffs even recognize that Strickland "did everything but file a grievance."  ECF No. 74 at 21.

(4:11cv862)

In total, these steps taken by members of the Unions cannot amount to "wholly irrational" conduct as a matter of law.  Strickland decided not to pursue a grievance after a thorough investigation in which everyone he spoke to agreed there was no breach of the CBA.  In light of this investigation, Strickland had a good faith belief that the grievance was meritless.  His decision, therefore, was not arbitrary.  While Plaintiffs may not like the decision that Strickland ultimately reached, their dissatisfaction does not allow the Court to ignore the actions taken by the Union and conclude that the decision not to pursue the grievance was arbitrary.  "[M]erely characterizing a union's conduct as arbitrary, perfunctory or demonstrative of bad faith is insufficient to withstand summary judgment."  *Summers*, 133 Fed. App'x at 253.

Plaintiffs incorrectly rely upon testimony by Strickland to suggest that not pursuing the grievance was arbitrary if Strickland believed the "wage reduction was wrong."  ECF No. 74 at 21.  Plaintiffs do not indicate where in the record this testimony appears.  Throughout his deposition, however, Strickland testified that he wished Plaintiffs could have kept their traditional wages.  *E.g.*, ECF No. 79-30 at 307 ("I wanted it just as much as they wanted it, as far as traditional wages.").  These comments are not conclusions about GM's obligations to pay Plaintiffs a certain wage under the CBA.  On this latter point, Strickland consistently testified that there was no violation of the CBA.  *E.g.*, ECF No. 79-30 at 178 ("No, there was no violation of the national agreement.  I wish there was.").

Alternatively, Plaintiffs argue that the Unions should have filed a grievance on behalf of Plaintiffs as a means to "test" the novel definitions of the Two-Tier Wage Structure.  ECF No. 82 at 31.  This argument is without merit.  First, Plaintiffs provide no support for the proposition

38

(4:11cv862)

that unions have an obligation to test a contractual interpretation that the union believes to be correct solely because a member of the union disagrees with the interpretation. As International UAW observes, this position ignores the fact that the relationship between labor and management is both adversarial and collaborative. ECF No. 90 at 17 n.12. It makes little sense to impose an obligation on unions to test by grievance contractual provisions that had just recently been negotiated. Second, the argument that the contract needed to be tested because it was ambiguous cuts in favor of the Union defendants. The decision to agree with the employer's interpretation of an ambiguous provision is not a breach of the duty of fair representation. *See Noble v. DaimlerChrysler Corp., Jeep Plant*, 2000 WL 923386, at *2 (6th Cir. June 29, 2000) ("This ambiguity supports the district court's conclusion that there was no breach of the duty of fair representation. Local 12's agreement with DaimlerChrysler's interpretation of an ambiguous contract is not irrational or arbitrary"). As such, the Court rejects Plaintiffs' argument that it was arbitrary for the Unions to fail to test the new Two-Tier Wage Structure.

The Court concludes that the Union conducted an adequate investigation into the merits of Plaintiffs' grievance before deciding not to pursue a grievance. Consequently, the Union defendants did not breach the duty of fair representation by allegedly failing to investigate Plaintiffs' complaints and requests for a grievance.

### 2. Temporary Acknowledgment Forms

Plaintiffs next argue that the Unions breached their duties of fair representation by failing to advise Plaintiffs that the Temporary Acknowledgment Forms were actually waivers of contractually guaranteed rights. ECF No. 69 at 20. As discussed above, however, the Temporary

39

(4:11cv862)

Acknowledgment Forms merely reflect the rights and protections that temporary employees have under the CBA.  See ECF Nos. 75-2 at 204–05; 75-7 at 2.  There is no waiver language contained in the Temporary Acknowledgment Forms.  Consequently, the Unions could not have acted arbitrarily by failing to advise Plaintiffs of a waiver that did not exist.  The Court grants summary judgment as to Plaintiffs' breach of the duty of fair representation claims relating to the Temporary Acknowledgment Forms.

### 3. Response to Job Offer and Permanent Employment

Plaintiffs argue that the Unions breached their duties of fair representation by failing to advise Plaintiffs about the terms and conditions of the Entry Level positions and by failing to attend the June 2008 meetings at which Plaintiffs signed the Response to Job Offer Forms.  ECF No. 69 at 20.  This argument is contradicted by both uncontested testimony and Plaintiffs' own admissions.  Committeeman Rick Ohl testified that Strickland told him to speak with Plaintiffs prior to the June 2008 meetings about the job offer.  Ohl made it clear that the Plaintiffs were being hired as Entry Level employees under the 2007 CBA.  ECF No. 79-32 at 36.  Werden also testified that he held meetings with Plaintiffs about the Entry Level job offer.  ECF No. 79-31 at 27.  Furthermore, Plaintiffs acknowledge that members of Local 1112 had met with them to discuss the effect that signing the Response to Job Offer would have on their wages.  *E.g.*, ECF Nos. 79-2 at 72–73; 79-10 at 71.

Moreover, Plaintiffs have failed to present any evidence that any of the Plaintiffs had requested that a union representative attend the June 2008 meetings.  Plaintiffs also fail to indicate any provision in the CBA or the UAW Constitution which required Local 1112 to

40

(4:11cv862)

provide temporary employees like Plaintiffs with representation at the June 2008 meetings even

when no request for representation is made.  Absent any evidence that the Unions ignored either

a request from Plaintiffs or an obligation under the CBA or the UAW Constitution, the Court

cannot conclude the Unions acted "wholly irrational" by failing to attend the meetings with

Plaintiffs.

Accordingly, the Court grants summary judgment as to Plaintiffs' breach of the duty of

fair representation claim as it relates to the Response to Job Offers.

### 4. Statements Concerning Wages

Plaintiffs next attack the comments that members of the Unions made regarding how long

it would take for Plaintiffs' wages to return to traditional levels.  Specifically, Plaintiffs argue

that the Unions acted in bad faith when members of Local 1112 "unequivocally" told Plaintiffs

their wages would return to traditional levels.  ECF No. 82 at 52.  The Court rejects Plaintiffs'

argument because the undisputed evidence falls short of establishing that Local 1112 acted

irrationality or in bad faith when officials told Plaintiffs their wages would return to traditional

wages.

The comments made to Plaintiffs, when evaluated "in light of the factual and legal

landscape at the time of the union's actions," were reasonable predictions about the likelihood

that Plaintiffs would return to traditional wages.  *See Garrison*, 334 F.3d at 538 (quoting *O'Neill*,

499 U.S. at 67).  At the time GM offered Plaintiffs Entry Level positions, GM was in the process

of adding a third shift to the Lordstown plant.  Local 1112 officials testified that they believed

Plaintiffs would be returned to traditional wages pursuant to the March 2008 Clarification and

41

(4:11cv862)

March 2008 Agreement when GM hired a sufficient number of Entry Level employees to the third shift to bump Plaintiffs up to traditional wages.  ECF Nos. 79-31 at 45–46; 79-32 at 58–59.  Plaintiffs admitted that Local 1112's officials explained the conditions that needed to occur before the Plaintiffs returned to traditional wages.  *E.g.*, ECF No. 79-6 at 81 ("because of third shift production coming on, which –  then we would meet our numbers in the plant to make us go back to traditional wage"); *accord* ECF Nos. 79-10 at 69; 79-12 at 38–39; 79–14 at 56.  Werden and Ohl did not know about GM's 2009 bankruptcy when they spoke with Plaintiffs about the prospect of returning to traditional wages.  ECF Nos. 79-32 at 59; 89 at 19 n.11.  As far as Local 1112 knew, there was no impediment to GM's plan to hire Entry Level employees for the third shift in large enough numbers that "the number of entry level employees working at [Lordstown would] equal the number of non-core jobs identified at that location."  *See* ECF No. 75-3 at 2 (March 2008 Clarification provision describing how Entry Level employees may return to traditional wages).  Therefore, Local 1112's predictions about Plaintiffs' wages were reasonable "in light of the factual and legal landscape" in which they made the prediction.

The same evidence supports the conclusion that Local 1112 did not promise in bad faith that Plaintiffs' wages would return to traditional levels.  In order to establish that Local 1112 acted with fraudulent, dishonest, or an intentionally misleading motive, *Merritt*, 613 F.3d at 619, Plaintiffs need to present "substantial evidence of fraud, deceitful action or dishonest conduct." *Humphrey*, 375 U.S. at 348; *Blake*, 247 Fed. App'x at 676.  Here, every official of Local 1112 testified they believed that GM had planned to hire 200 Entry Level employees.  ECF Nos. 79-30 at 176 (Strickland); 79-31 at 45–46 (Werden); 79-32 at 58–59 (Ohl).  Plaintiffs present no

42

(4:11cv862)

evidence that contradicts the testimony of the Local 1112 officials.  Instead, Plaintiffs argue that

the comments amount to bad faith when "viewed in the context of the Local's actions."  ECF No.

82 at 52–53.  Plaintiffs' argument, however, is bereft of any evidence that may be used to defeat

summary judgment; instead, Plaintiffs reargue—in conclusory fashion—that the other alleged

breaches of the duty of fair representation, taken together with the statements about Plaintiffs'

wages, "illustrate fraudulent, deceitful, and dishonest conduct."  ECF No. 82 at 53.  "Conclusory

allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to

defeat a well-supported motion for summary judgment."  *Gooden*, 67 Fed. App'x at 895 (citing

*Lujan*, 497 U.S. at 888).

Plaintiffs cannot show that officials of Local 1112 acted in a wholly irrational manner or

with intent to deceive Plaintiffs about returning to traditional wages.  Accordingly, the Court

grants summary judgment to Defendants.

### 5. Producing Documents During the Internal Appeals

Plaintiffs argue that the Unions breached their duties of fair representation by withholding

documents from the Plaintiffs during the appeals process.  ECF No. 69 at 20.  Specifically,

Plaintiffs allege that the Unions withheld the March 2008 Agreement from the Plaintiffs until

after the local membership and IEB Hearing steps of the internal appeals process, and that the

Unions withheld the March 2008 Clarification from Plaintiffs throughout the entire internal

appeals process.  ECF No. 82 at 60.  Plaintiffs also allege that the Unions withheld a document

43

(4:11cv862)

referred to as "the secret letter"[7] and the requests for extension.  ECF No. 77-3 at 8.

The Court rejects Plaintiffs' argument.  The undisputed evidence reveals that the Unions did in fact provide Plaintiffs with the requested documents.  The PRB decision reflects that the Unions had provided the requests for extensions, the July 14 letter, and the March 2008 Agreement to the Plaintiffs.  ECF No. 75-20 at 17 n.60 (March 2008 Agreement), 20 (the July 14 letter), 30 n.67 (requests for extensions).  Moreover, the PRB considered these documents and concluded that the documents did not support filing a grievance on behalf of Plaintiffs.  ECF No. 75-20 at 30.  In light of these undisputed facts, Plaintiffs' complaint that the Unions withheld the documents through the first two steps of the appeals process instead suggests that the Unions did not provide the documents soon enough rather than at all.[8]  ECF No. 82 at 34.  What the Unions should have done, however, is not sufficient to meet the high standard for arbitrariness needed to establish a breach of the duty of fair representation.  *See Ruzicka v. Gen. Motors Corp.*, 649 F.2d 1207, 1212 (6th Cir. 1981) ("This view is supported by the decisions of the other circuits which are unanimous in holding that ordinary negligence, without more, cannot establish a breach of the duty of fair representation.").

---

[7]  The so-called "secret letter" refers to a July 14 letter from Schwartz to Grimes that authorized the hiring of 200 temporary employees in 2008.  The purpose of the hiring of temporary employees for the third shift that GM was due to the fact that GM and the union had concerns that GM might not have been able to keep the third shift working at the time because of the financial difficulties the company was experiencing in summer 2008.  ECF No. 79-34 at 73.

[8]  The PRB decision likewise admonishes the Unions for how they should keep their records going forward to "satisfy the union's duty of rationality and fairness."  ECF No. 75-20 at 30–31.

44

(4:11cv862)

Plaintiffs indicate that the March 2008 Clarification was not included in the record before the PRB and speculate that the PRB may have ruled differently had it been aware of the other attempt to clarify the Entry Level MOU. ECF No. 82 at 34. This does not rescue Plaintiffs' argument. First, speculation is not evidence that may be used to survive summary judgment. *Gooden*, 67 Fed. App'x at 895 (citing *Lujan*, 497 U.S. at 888). Second, the PRB concluded that the documents and testimony were "sufficient" to support the Union's conclusion, suggesting that one more document would not have affected their decision. ECF No. 75-20 at 30. Third, the March 2008 Clarification would not have assisted Plaintiffs' appeal, as it supports the Unions' position that Plaintiffs were properly hired as Entry Level employees and therefore their grievance request lacked merit. Therefore, Plaintiffs cannot rely on the absence of the March 2008 Clarification from the PRB record as evidence that the Unions acted "arbitrary, discriminatory, or in bad faith." *Merritt*, 613 F.3d at 619.

Plaintiffs cannot show that either Local 1112 or International UAW acted "arbitrary, discriminatory, or in bad faith" in the production of documents for the internal appeals process. Therefore, the Court grants Defendants summary judgment.

**C. Breach of the Duty of Fair Representation Under 29 U.S.C. § 159**

Plaintiffs argue that Local 1112 and International UAW have also breached their duties of fair representation under action 29 U.S.C. § 159. ECF No. 74 at 22–23. While Plaintiffs pursued summary judgment under "two separate statutory theories," Plaintiffs concede that their entitlement to relief under either claim is predicated upon the same set of facts. ECF No. 74 at 23. The Court has concluded that the facts of this case do not give rise to a breach of the duty of

45

(4:11cv862)

fair representation as part of a hybrid § 301 claim.  For the same reasons, the Court concludes that Plaintiffs cannot demonstrate that Local 1112 or International UAW breached the duty of fair representation under 29 U.S.C. § 159.  *See Breininger*, 493 U.S. at 80–81; *Burkholder*, 444 F. Supp. 2d at 821.  Defendants' Motions for Summary Judgment are granted as to Plaintiffs' duty of fair representation under 29 U.S.C. § 159.

## IV.  Conclusion

For the foregoing reasons, the Court hereby grants Defendants' Motions for Summary Judgment (ECF No. 76; 77; 78) and denies Plaintiffs' Motion for Partial Summary Judgment (ECF No. 74).  Furthermore, the Court denies as moot Plaintiffs' Motion to Substitute Party (ECF No. 98).


IT IS SO ORDERED.


  October 31, 2014                           /s/ Benita Y. Pearson
Date                                        Benita Y. Pearson
                                            United States District Judge

46